**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THOMAS EDWARDS AND MICHAEL
FORTUNE, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

          Plaintiffs,

    v.

SEQUOIA FUND, INC., A MARYLAND
CORPORATION,

          Defendant.

Civil Action No: 1:18-cv-04501(GBD)

CLASS ACTION

ORAL ARGUMENT REQUESTED

---

## MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT
## SEQUOIA FUND, INC. TO DISMISS THE CLASS ACTION COMPLAINT

Robert A. Skinner
Amy D. Roy
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560

Lee S. Gayer
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 841-0626

*Attorneys for Defendant Sequoia Fund, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 4

    A.    The Sequoia Fund ............................................................................... 4

    B.    The Concentration Policy ............................................................ 5

    C.    The Fund's Investment in Valeant.................................................. 6

    D.    The State Court Action ...................................................................... 8

    E.    The Allegations of the Complaint............................................. 10

CHOICE OF LAW AND LEGAL STANDARD............................................................ 11

ARGUMENT.................................................................................................................... 12

I.     THE PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THE
EXISTENCE OF AN ENFORCEABLE CONTRACT....................................... 12

II.    THE PLAINTIFFS HAVE FAILED TO ALLEGE ANY VIOLATION OF
THE FUND CONCENTRATION POLICY ........................................................ 18

CONCLUSION................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................12

*In re Charles Schwab Corp. Secs. Litig.*,
    No. C 08-01510, 2009 WL 1371409 (N.D. Cal. May 15, 2009)...........................15, 16

*Coronel v. Quanta Capital Holdings, Ltd.*,
    No. 7 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009).....................................12

*Epstein v. Ruane, Cunniff & Goldfarb Inc.*,
    No. 650100/2016 (N.Y. Sup. Ct. N.Y. Cty.), *aff'd*, 2018 NY Slip Op.
    04970, 2018 WL 3277555 (N.Y. App. Div., 1st Dep't July 5, 2018) .....................2, 10

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)...........................................................................7

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) .............................................................................3

*McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) .............................................................14, 15, 16

*New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*,
    41 N.Y.S.3d 1 (N.Y. App. Div., 1st Dep't 2016) .....................................................11

*Northstar Fin. Advisors v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) .......................................................................15

*Oliveira v. Sugarman*,
    130 A.3d 1085 (Md. Ct. Spec. App. 2016)...................................................13, 15, 16

*Oliveira v. Sugarman*,
    152 A.3d 728 (Md. 2017) .........................................................................11, 13, 14

*In re Optimal U.S. Litig.*,
    813 F. Supp. 2d 351 (S.D.N.Y. 2011)..................................................................11

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)...........................................................................1, 3

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
    81 F.3d 1224 (2d Cir. 1996)...........................................................................11

*Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*,
  No. 653665/2011, 2012 WL 6929336 (N.Y. Sup Ct. N.Y. Cty. Nov.
  30, 2012) ...........................................................................................................14

**Statutes**

Investment Company Act of 1940 ...........................................................1, 4, 10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................................................1, 12

**Other Authorities**

*Bausch Health Cos. Inc.*, Wall St. J., https://quotes.wsj.com/BHC....................................7

Enhanced Disclosure and New Prospectus Delivery Option for Registered
  Open-End Management Investment Companies, 74 Fed. Reg. 4546
  (Jan. 26, 2009)...............................................................................................17

*How to Read a Mutual Fund Prospectus (Part 1 of 3: Investment
  Objective, Strategies, and Risks)*, Secs. & Exch. Comm'n (June 13,
  2016), https://www.investor.gov/news-alerts/investor-bulletins/how-
  read-mutual-fund-prospectus-part-1-3-investment-objective-strateg .........................17

*How to Read a Mutual Fund Prospectus (Part 3 of 3: Management,
  Shareholder Information, and Statement of Additional Information)*,
  Secs. & Exch. Comm'n (June 13, 2016),
  https://www.investor.gov/news-alerts/investor-bulletins/how-read-
  mutual-fund-prospectus-part-3-3-management-shareholder-infor ............................16

*Information Available to Investment Company Shareholders*, Secs. &
  Exch. Comm'n (last modified Apr. 15, 2010),
  https://www.sec.gov/fast-answers/answersmfinfohtm.html ........................................17

1 Thomas P. Lemke, et al., <u>Regulation of Investment Companies</u> § 7.10[2]
  (Matthew Bender, rev. ed. 2018) ................................................................20

Registration Form Used by Open-End Management Investment
  Companies; Guidelines, 48 Fed. Reg. 37,928-02, Guide 19 (Aug. 22,
  1983) ...........................................................................................1, 6, 18, 19

Registration Form Used by Open-End Management Investment
  Companies, 63 Fed. Reg. 13,916-01 (Mar. 23, 1998) ............................................5, 19

SEC Form N-1A ...............................................................................5, 16, 17

Defendant Sequoia Fund, Inc. (the "Fund"), a mutual fund organized under Maryland law and registered under the federal Investment Company Act of 1940 (the "ICA"), submits this memorandum in support of its motion to dismiss the plaintiffs' Class Action Complaint ("Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Like all mutual funds, the Fund is required by the rules of the Securities and Exchange Commission (the "SEC") to file periodically a Prospectus and Statement of Additional Information ("SAI"). These disclosure documents are designed to provide information to prospective investors about the Fund. These disclosure documents are not contracts between the investors and the Fund.

One of the informational disclosures in the Fund's SAI states that the Fund will not "[c]oncentrate investments in an industry, as concentration may be defined under the [ICA] or the rules and regulations thereunder." Ex. A, SAI, at 4.[1] The SEC has made clear that these concentration limits require only that "no further investment may be made in any given industry if, upon making the proposed investment, 25 percent or more of the value of the registrant's assets would be invested in such industry." *See* Registration Form Used by Open-End Management Investment Companies; Guidelines ("1983 Guidelines"), 48 Fed. Reg. 37,928-02, 37,962, Guide 19 (Aug. 22, 1983). But "when securities of a given industry come to constitute more than 25 percent of the value of the registrant's assets by reason of changes in value" – which is precisely what occurred here, as described below – "the excess need not be sold." *Id.*

---

[1] In deciding this motion, the Court may rely on the Fund's publicly filed disclosure documents – such as the Prospectus and SAI – which are judicially noticeable. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). A number of these public filings are annexed to the accompanying Declaration of Lee S. Gayer ("Gayer Decl."). Numerical page references herein preceded by "Ex." are to the pages of exhibits to the Gayer Declaration.

This putative class action arises from the Fund's investment in shares of Valeant Pharmaceuticals, Inc. ("Valeant"), a pharmaceutical company whose share price increased dramatically in the years after the Fund first made its investment in 2010, and then experienced a significant price decline in late 2015.  The plaintiffs allege that the Fund's investment in Valeant violated the Fund's industry concentration limit described in the SAI, which the Complaint refers to as the Fund's "Concentration Policy."  Compl. ¶¶ 4-6.  Although the Complaint's sole cause of action is for breach of contract, the plaintiffs do not identify any contract between the Fund and the shareholders pursuant to which the shareholders would have the right to assert a claim for a breach of contract for an alleged breach of the Concentration Policy.  Instead, the plaintiffs allege that the description of the Concentration Policy in the Fund's SAI constitutes a "contractual agreement" between the Fund and its shareholders.  *Id.* ¶¶ 1-2, 4.  This assertion of a contract is contrary to clear and longstanding Court precedent and SEC pronouncements.  Moreover, the plaintiffs do not allege that the Fund made any *purchases* of Valeant shares that caused the Fund to "breach" the Concentration Policy limit.  The plaintiffs concede that a *passive* increase in the *value* of the Valeant shares over time caused the Fund's holdings of healthcare industry assets to exceed the 25% limit.  *See id.* ¶¶ 4, 27-29.  The assertion by plaintiffs that this passive increase in value violates the Concentration Policy is also contrary to clear and longstanding SEC rulemaking and guidance.

The plaintiffs' patently false interpretation of the Fund's Concentration Policy was previously the subject of a failed derivative lawsuit filed in New York Supreme Court (New York County) before Justice O. Peter Sherwood (the "State Court Action").  *See* Compl. ¶ 28 & n.1.[2]  The lead plaintiff in that case, Stanley H. Epstein (who then purported to sue *on behalf of*

---

[2] The State Court Action is entitled *Stanley H. Epstein et al. v. Ruane, Cunniff & Goldfarb Inc., et al.* ("*Epstein*"), No. 650100/2016 (N.Y. Sup. Ct. N.Y. Cty.).  The filings in the State Court Action are referred to in the Complaint.

*the Fund*), now appears in this action as counsel for the plaintiffs (who assert a claim *against the Fund*).  Justice Sherwood dismissed the State Court Action based on the plaintiffs' inability to demonstrate an excuse for their failure to make a pre-suit demand on the Board.  However, after extensive briefing and oral argument, Justice Sherwood also stated that the plaintiffs' underlying claim with respect to the Fund's Concentration Policy – *i.e.*, that even a passive increase in the Fund's holdings due to an increase in share price (as opposed to purchases) could cause the Fund to exceed the 25% limit – was contrary to the plain wording of the Concentration Policy and clear guidance issued by the SEC.  Justice Sherwood stated that, in his view, the plaintiffs' claim was so weak that it would be a "fool's errand" for Mr. Epstein and his co-plaintiffs to try to re-plead in order to pursue their underlying claim.  Justice Sherwood's dismissal was affirmed on appeal.

Apparently displeased with the direction of the State Court Action, Mr. Epstein withdrew as the lead named plaintiff and attempted to disassociate himself from the case.  Mr. Epstein has now surfaced in this action as an attorney rather than as a plaintiff, asserting the same facts and the same alleged breach of the Concentration Policy in a re-packaged "breach of contract" claim *against* the Fund, rather than the breach of fiduciary duty claim he asserted previously *on behalf of* the Fund.  However, aside from shifting from state to federal court, modifying the underlying legal basis for his claims, and his conflicted roles, Mr. Epstein, as attorney here for the plaintiffs, continues to advance the same patently incorrect interpretation of the Fund's Concentration Policy that he, as a plaintiff, sought to assert in the State Court Action – and then abandoned after Justice Sherwood expressed his view that the claim lacked merit.  This Court should reject

Compl. ¶ 28 n.1. Thus, they form the basis of the plaintiffs' claims and may be considered by the Court in adjudicating this motion.  *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Moreover, the Court can take judicial notice of public court filings and other publicly filed documents.  *See Rothman*, 220 F.3d at 92.

the plaintiffs' inappropriate forum shopping and meritless claim, and should dismiss the Complaint as a matter of law for two independent reasons.

*First*, the Complaint is based on the incorrect premise that a policy described in the Fund's SAI constitutes a contract between the Fund and the shareholders.  Courts around the country have repeatedly held that policies contained in a company's proxies, prospectuses, and other mandatory disclosure documents do <u>not</u> constitute a contractual arrangement between the shareholders and the company.  This rule applies with particular force to policies contained in public filings by mutual funds.  The SEC has repeatedly made clear both in SEC publications and in formal rulemaking that mutual fund prospectuses and SAIs are mandatory disclosure documents intended to provide potential investors with information they can consider in making an investment decision.  Thus, the description of a policy in a fund's SAI, such as the Concentration Policy at issue here, is not a contract and cannot form the basis of a breach of contract claim.

*Second*, even if the plaintiffs could establish that a valid contract exists, the Complaint fails to allege any violation of the purported contract.  As Justice Sherwood correctly observed, both the Fund's SAI and SEC guidelines make clear that the 25% limit on Fund investments in a single industry applies only to situations where the *acquisition* of shares causes the Fund's position to exceed the 25% limit, not to situations where the 25% limit is exceeded due to the rise in value of the investment's share price, which is what the plaintiffs allege here.  For this reason as well, the Complaint should be dismissed in its entirety with prejudice.

## BACKGROUND

### A.      The Sequoia Fund

The Fund is an open-end mutual fund organized under Maryland law and registered under the ICA – the federal statute established to regulate mutual fund companies.  *See* Compl.

4

¶ 12.  The Fund is expressly designated in its disclosure documents filed with the SEC as a "non-diversified" fund, *see* Ex. B, Prospectus, at 2, meaning that it invests its assets in a smaller number of companies than many other funds.  The Fund fully disclosed its strategies, policies, procedures, and risks in its Prospectus and SAI, which were publicly filed with the SEC.  *See* Compl. ¶¶ 16, 21-22.  These documents described the Fund's policies, including limits on concentration of assets in a single issuer or industry.  *Id.* ¶¶ 21-22.

### B. The Concentration Policy

The Fund's policies concerning concentration of investment assets are described in the Fund's SAI, one of the Fund's disclosure documents that is required to be filed with the SEC. *See* Registration Form Used by Open-End Management Investment Companies ("1998 Final Rule"), 63 Fed. Reg. 13,916-01, 13,927 (Mar. 23, 1998); SEC Form N-1A, at 6 (Item 4(a)).  The Fund's SAI contains two policies relating to concentration of investments.  One policy relates to investments in the securities of a single issuer.  It provides that the Fund may not "[i]nvest more than 25% of the value of its net assets (*at the time of purchase and after giving effect thereto*) in the securities of any one issuer."  Ex. A, at 4 (emphasis added).  Thus, the text of the policy makes clear that the limit applies only where the *acquisition* of shares causes the Fund's position to exceed the 25% limit.

The second policy, and the one that is the focus of the Complaint, relates to investments in a particular industry.  That policy, which the Complaint refers to as the "Concentration Policy," states that the Fund may not:

> Concentrate investments in an industry, as concentration may be defined under the [ICA] or the rules and regulations thereunder (as such statute, rules or regulations may be amended from time to time) or by guidance regarding interpretations of, or exemptive orders under, the [ICA] or the rules or regulations thereunder published by appropriate regulatory authorities.

Ex. A, at 4; Compl. ¶ 22.

As alleged in the Complaint, the SEC has issued guidance that makes clear that, as with the single issuer limitation, the industry Concentration Policy limit applies only where the *acquisition* of shares causes the Fund's position to exceed the 25% limit.  *See* Compl. ¶ 24. Specifically, the SEC's 1983 Guidelines, which are referred to in the Complaint, *see* Compl. ¶ 24, provide that "no further investment may be made in any given industry *if, upon making the proposed investment*, 25 percent or more of the value of the registrant's assets would be invested in such industry."  *See* 1983 Guidelines, 48 Fed. Reg. at 37,962 (emphasis added).  The 1983 Guidelines go on to state that "when securities of a given industry come to constitute more than 25 percent of the value of the registrant's assets by reason of changes in value of either the concentrated securities or the other securities, the excess need not be sold."  *Id.*

The Complaint does not point to any SEC publication that alters the SEC's position concerning the issue of concentration, *i.e.*, that only purchases – not increases in share price – can cause a fund to be in violation of such a policy.

### C.    The Fund's Investment in Valeant

The Complaint alleges that the Fund began investing in Valeant in 2010.  Compl. ¶ 25. The plaintiffs allege that "[s]ometime during the first quarter of 2015, the Fund was in violation of its fundamental Concentration Policy."  *Id.* ¶ 26.  The Complaint alleges that on March 31, 2015, the Fund held 27.3% of its net assets in healthcare industry stocks, with 26% of its net assets invested in Valeant.  *Id.*  On June 30, 2015, the Fund held 30% of its net assets in healthcare industry stocks, with 28.7% of its net assets invested in Valeant.  *Id.*  On September 30, 2015, the Fund held 26% of its net assets in healthcare industry stocks, with 24.8% of its net assets invested in Valeant.  *Id.*  The plaintiffs allege that "[a]s a result of Sequoia's breach of its Concentration Policy, the Fund declined substantially in value," which "result[ed] in massive

losses" to shareholders.  *Id.* ¶ 29.

Significantly, the Complaint does not allege that the Fund made any *purchases* of shares of Valeant or any other healthcare industry stock that caused the Fund to exceed the 25% limit. To the contrary, the Complaint concedes that the Fund's positions in healthcare industry stocks came to exceed the "Concentration Policy" limit due solely to the increase in Valeant's share price, not because of any additional purchase of shares.  *Id.* ¶ 4.  In fact, as reflected in the Fund's publicly filed quarterly disclosures, the Fund did not purchase shares in Valeant or other healthcare industry stocks in violation of the Concentration Policy.

For example, during the quarter immediately preceding the time period when, according to the plaintiffs, the Fund was in violation of the Concentration Policy (*i.e.*, the quarter ending December 31, 2014), the Fund owned 11,281,224 shares of Valeant, which were priced at $143.11 per share and represented 20% of the Fund's net assets.[3]  Ex. C, Form N-CSR ("Annual Report"), Dec. 31, 2014, at 19-20.  As of that date, the value of the Fund's holdings in healthcare industry stocks totaled 21.4% of net assets.  *Id.* at 19.  Through September 2015, the value of the Fund's holdings in Valeant increased, but due only to the rise in Valeant's share price – and not the purchase of any additional Valeant shares.  For example, by March 31, 2015, Valeant's share price rose to $198.62 per share.  At that time, the Fund held the exact same number of shares as it did as of December 31, 2014 (11,281,224), but due to the increase in value, the shares were worth $2,240,676,711, representing 26% of the Fund's net assets.  Ex. D, Form N-Q ("Quarterly Report"), Mar. 31, 2015, at 2-3; Compl. ¶ 26.  By June 30, 2015, Valeant's share price reached $222.15, and the Fund's 11,281,224 shares were worth $2,506,123,912, or 28.7% of the Fund's

---

[3] References to share prices, of which the Court may take judicial notice, are included herein.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).  Specific references to the historical prices reflect the prices stated in the *Wall Street Journal* for the relevant date.  *Bausch Health Cos. Inc.*, Wall St. J., https://quotes.wsj.com/BHC (last visited July 19, 2018) (In May 2018, Valeant announced it was changing its name to Bausch Health Companies.).

net assets.  Ex. E, Form N-CSR ("Semi-Annual Report"), June 30, 2015, at 9-10; Compl. ¶ 26.

The Valeant stock price continued to rise to a peak of $262.52 a share on August 5, 2015 – an

increase of well over 800% since the end of 2010.  By September 30, 2015, the Valeant share

price fell to $178.38, and the shares were worth $2,012,248,055, or 24.8% of the Fund's net

assets.  Ex. F, Quarterly Report, Sept. 30, 2015, at 2-3; Compl. ¶ 26.

Throughout this time, the Fund held on to its Valeant shares but did not purchase any

additional shares.  *See* Compl. ¶ 26.  In fact, the number of Valeant shares the Fund owned on

September 30, 2015 declined slightly from June 30, 2015, decreasing from 11,281,224 shares to

11,280,682 shares.  *See* Ex. E, at 9; Ex. F, at 2.[4]  Accordingly, it is undisputed that the Fund did

not make any purchases that caused the Fund to exceed the Concentration Policy limit.

### D.    The State Court Action

As noted above, one of the plaintiffs' attorneys in this Action – Mr. Epstein – was the

lead plaintiff in the State Court Action – a New York state court derivative suit filed in Supreme

Court, New York County.  Mr. Epstein filed the State Court Action purportedly to pursue claims

on behalf of the Fund against the Fund's adviser, Ruane, Cunniff & Goldfarb Inc. (the

"Adviser"), and several independent members of the Fund's Board of Directors (the "Board").

Dkt. No. 43 (Am. Compl.) ¶¶ 1-2.[5]  The plaintiffs in the State Court Action based their claims of

breach of fiduciary duty primarily on the contention that the Adviser and the Board allowed the

Fund's investment in Valeant to exceed the industry Concentration Policy.  *Id.* ¶ 137.  Like the

---

[4] The Fund also did not purchase any additional shares of any stocks in the healthcare industry from December 31, 2014 through September 30, 2015.  *See* Ex. C, at 19; Ex. F, at 2.  In addition to Valeant, during this time period, the Fund held interests in three other healthcare industry stocks: Perrigo Company plc ("Perrigo"), West Pharmaceutical Services, Inc. ("West"), and Zoetis, Inc. ("Zoetis").  *See* Ex. C, at 19; Ex. F, at 2.  From December 31, 2014 through September 30, 2015, the Fund's holdings in Perrigo decreased from 527,122 shares to 459,618 shares.  *See* Ex. C, at 19; Ex. F, at 2.  Likewise, the Fund's holdings in West decreased from 430,615 to 430,594 shares, and the Fund's holdings in Zoetis decreased from 19,932 to 19,931 shares.  *See* Ex. C, at 19; Ex. F, at 2.

[5] References to "Dkt. Nos." are to the pleadings, motion papers, and other documents filed in the State Court Action.

plaintiffs in this action, Mr. Epstein and his co-plaintiffs in the State Court Action took the position that the passive increase in the value of the Fund's investment in Valeant caused the Fund to violate the policy.  Specifically, the plaintiffs contended that the Fund was in violation of the Concentration Policy "by *maintaining* investments comprising over 25% of its total net assets in companies that are classified as being within the same industry."  Dkt. No. 87 (Pls.' Mem. of Law in Opp. to Defs.' Mots. to Dismiss), at 34 (emphasis added).

The defendants in the State Court Action filed separate motions to dismiss Mr. Epstein's complaint on various grounds, including that the plaintiffs' interpretation of the Concentration Policy was incorrect.  Specifically, the defendants pointed out in their respective memoranda of law that "the text of the Fund SAI and SEC guidelines . . . make clear that those [Concentration Policy] limits apply only where the *acquisition* of shares causes the Fund's position to exceed the 25% limit, not to situations in which the position passively increases due to the rise in value of the investment's share price, which is what Plaintiffs allege occurred with Valeant."  Dkt. No. 90 (Independent Directors' Reply Mem. in Further Supp. of Mot. to Dismiss), at 9; *see* Dkt. No. 56 (Adviser's Mem. of Law in Supp. of Mot. to Dismiss), at 20-23.

On February 15, 2017, Justice Sherwood heard lengthy oral argument on the defendants' motions to dismiss, during which the plaintiffs' Concentration Policy theory and the related SEC guidance were addressed in detail.  *See generally* Dkt. No. 96 (Decision and Hearing Transcript). At the conclusion of the hearing, Justice Sherwood dismissed the State Court Action on the ground that the plaintiffs did not demonstrate an adequate excuse for their failure to make a pre-suit demand on the Board.  Accordingly, it was unnecessary for Justice Sherwood to address the merits of the plaintiffs' underlying breach of fiduciary duty claims.  However, Justice Sherwood made clear on the record his view that the plaintiffs' claims – including their interpretation of the

Concentration Policy – were meritless.  In responding to an inquiry by the plaintiffs' counsel as to whether they would be allowed to re-plead, Justice Sherwood stated that given the weakness of the plaintiffs' underlying claims, doing so "would be a fool's errand."  *Id.* at 70 (Hearing Transcript).

As noted above, after the dismissal Mr. Epstein disassociated himself from the State Court Action.[6]  The remaining plaintiff in the State Court Action filed an appeal of the dismissal order.  Br. for Pl.-Appellant, *Epstein* (filed Dec. 21, 2017).  On July 5, 2018, the New York Appellate Division, First Department affirmed Justice Sherwood's dismissal order.  *Epstein*, 2018 NY Slip Op. 04970, 2018 WL 3277555 (N.Y. App. Div., 1st Dep't July 5, 2018).

### E.    The Allegations of the Complaint

On May 21, 2018, the plaintiffs filed their Complaint, asserting a single breach of contract claim against the Fund.  Compl. ¶ 35.  They assert this claim based on the allegation that the Fund's Concentration Policy – specifically the policy limiting the assets held by the Fund in an individual industry to no more than 25% of Fund assets – is set forth in the Fund's SAI and incorporated by reference into its Prospectus.  *Id.* ¶¶ 43, 45.  The plaintiffs contend that the Concentration Policy is a "fundamental" Fund policy and that under the ICA it can only be changed by shareholder vote.  *Id.* ¶¶ 18-21.

The plaintiffs contend that the Fund's "Prospectus and SAI represent an offer by [the Fund] to sell shares in the Fund and a contractual commitment by [the Fund] to manage the investments of all shareholders in the Fund pursuant to all listed fundamental investment SAI policies, including the Concentration Policy."  *Id.* ¶ 45.  The plaintiffs further contend that they

---

[6] At Mr. Epstein's request, and immediately prior to the deadline for filing an appeal of Justice Sherwood's dismissal order, the parties to the State Court Action entered into a stipulation pursuant to which Mr. Epstein and his wife voluntarily withdrew as plaintiffs and had the caption modified to remove their names. Dkt. No. 104 (Stipulation).

and other members of the class "accepted" this purported "offer" when they purchased and held shares in the Fund.  *Id.* ¶ 46.  The plaintiffs allege that the Fund "breach[ed]" the contractual agreement with the shareholders "by allowing its investment in healthcare industry stocks . . . to exceed 25% of the value of its net assets and failing to take any action to bring the Fund within its policy limitations." *Id.* ¶¶ 50-51.

## CHOICE OF LAW AND LEGAL STANDARD

The plaintiffs allege diversity of citizenship as the basis of jurisdiction for this Court. Compl. ¶ 7.  "In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law."  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 374 (S.D.N.Y. 2011).  Here, New York law provides that "[u]nder the internal affairs doctrine, claims concerning the relationship between the corporation, its directors, and a shareholder are governed by the substantive law of the state or country of incorporation."  *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*, 41 N.Y.S.3d 1, 6 (N.Y. App. Div., 1st Dep't 2016) (citation omitted); *see Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) (under New York law, "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation") (citations omitted).

While application of the internal affairs doctrine would point to Maryland law as governing the plaintiffs' breach of contract claim, Maryland courts have also applied the doctrine *lex loci contractus*, which applies the law of the jurisdiction where the contract was made, in determining whether a contract was formed.  *See, e.g.*, *Oliveira v. Sugarman*, 152 A.3d 728, 743-45 & n.17 (Md. 2017) (applying New York law and rejecting claim that a publicly filed proxy constitutes an enforceable contract).  Thus, because the Fund is alleged to be headquartered in New York, Compl. ¶ 13, it could be argued that New York law should govern the contract

formation issue.  As explained below, because the common law elements of contract formation –

offer, acceptance, and consideration – are identical in both Maryland and New York, the

plaintiffs' breach of contract claim fails regardless of which state's law applies, as the cases

discussed below demonstrate.

Although state substantive law applies to the plaintiffs' claim, federal law governs

procedural issues, including the pleading requirements applicable to this Motion.  Specifically,

Rule 12(b)(6) requires dismissal when the allegations of the complaint fail to provide "'plausible

grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery

will reveal evidence' to support them."  *Coronel v. Quanta Capital Holdings, Ltd.*, No. 7 Civ.

1405, 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 556 (2007)).  Though well pleaded facts are taken as true, "[a]llegations that are

conclusory or unsupported by factual assertions are insufficient."  *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

## ARGUMENT

## I.    THE PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THE EXISTENCE OF AN ENFORCEABLE CONTRACT

The plaintiffs' breach of contract claim rests on the fundamentally flawed contention that

a Fund policy described in a mandatory disclosure document constitutes an enforceable

contractual agreement between the Fund and its shareholders.  Courts in Maryland and around

the country have rejected the premise that a policy described in a publicly filed disclosure

document constitutes a contractual agreement, and clear SEC guidance likewise confirms that

mutual fund disclosures – particularly policies set forth in a fund's SAI – serve informational

purposes only and do not establish a contractual arrangement between shareholders and a fund.

Recently, in *Oliveira v. Sugarman*, 130 A.3d 1085 (Md. Ct. Spec. App. 2016), the Maryland Court of Special Appeals rejected the claim that a company policy set forth in a publicly filed proxy statement constitutes a contract between a corporation and its shareholders. In *Oliveira*, the company – iStar Financial, Inc. ("iStar") – filed a proxy statement with the SEC concerning an amendment of the company's performance-based executive compensation plan. *Id.* at 1089-90. The terms of the new plan – referred to as the "2009 Plan" – were attached to the proxy. *Id.* at 1090. The 2009 Plan was voted on and approved by iStar's shareholders. The plaintiffs in *Oliveira* alleged that iStar issued executive compensation awards in violation of the 2009 Plan. They further alleged that "the 2009 Plan constitutes a contract between the Board and the iStar shareholders." *Id.* at 1102. Specifically, the plaintiffs alleged that "a contract was formed through the Proxy Statement's proposal of the 2009 Plan and the 2009 Plan's subsequent approval by shareholders." *Id.* The Maryland Court of Special Appeals rejected the plaintiffs' contention. After reciting the elements of contract formation under Maryland law, the court ruled that the plaintiffs had failed to allege that either the proxy or the 2009 Plan constituted an offer to the shareholders. *Id.* at 1102-03. The court further ruled that "[b]ecause the [s]hareholders have not alleged facts and cited to relevant authority which would support a finding of the existence of a contract, the breach of contract claim must fail." *Id.* at 1103.

The Maryland Court of Appeals – the state's highest court – affirmed the intermediate appellate court's determination that the proxy statement and the attached plan did not form a contract upon which shareholders could asset a breach of contract claim. *See Oliveira*, 152 A.3d at 745. The Maryland Court of Appeals, under the *lex loci* doctrine and the choice of law provision in the proxy, applied New York law in rejecting the plaintiffs' contract claim. *Id.* at 743. Applying the same contract formation elements as those applied by the lower court, the

Court of Appeals determined that no contract was formed because the 2009 Plan did not "contain any provision extending a contract offer to the shareholders," noting that the plan did not "make a promise to shareholders in exchange for any action or promise in return." *Id.* at 744. "[W]ithout language indicating a clear offer and intent to be bound," the Court of Appeals concluded, the plan could not constitute a contract between shareholders and the corporate board under New York law. *Id.* at 745.[7]

The analysis applied by the courts of Maryland and New York is consistent with the decisions of other courts that have addressed the issue. For example, in *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003), the very claim that the plaintiffs advance here – that the mandatory filing of a prospectus creates a contractual agreement between the shareholders and the corporation – was rejected by the Ninth Circuit. In *McKesson*, the plaintiff, McKesson HBOC, Inc. ("McKesson"), filed a complaint for unjust enrichment against the shareholders of a company acquired by McKesson in a merger transaction. *Id.* at 1089-90, 1091. The defendants asserted that the claims at issue were covered by a contract between the defendants and McKesson, thus defeating any equitable claim for unjust enrichment. Specifically, the defendants contended that the prospectus filed by McKesson in connection with the merger, which was a required filing under federal securities laws, "should be construed as an acceptance of McKesson's offer to sell the newly issued shares, thus creating a contract." *Id.* at 1092. The Ninth Circuit, applying Delaware law, rejected the defendants' contention, holding that "the term offer has a different and far broader meaning in securities law

---

[7] The Maryland Court of Appeals' interpretation of New York law applicable to the contract formation issue is consistent with the legal analysis applied by the courts of New York. For example, in *Stichting Pensioenfonds ABP v. Credit Suisse Group AG*, No. 653665/2011, 2012 WL 6929336 (N.Y. Sup Ct. N.Y. Cty. Nov. 30, 2012) – a case involving statements set forth in a mandatory prospectus filed in connection with a mortgage-backed securities offering – the New York Supreme Court specifically ruled that "[a] prospectus, or a prospectus supplement, is indeed not a contract." *Id.* at *5.

than in contract law," and ruled that the "Fund's effort to equate an offer and acceptance in the realm of contracts with a securities offer and ratification [wa]s . . . unavailing." *Id.* at 1092-93 (internal quotation marks omitted).[8]

Likewise, in *In re Charles Schwab Corp. Securities Litigation*, No. C 08-01510, 2009 WL 1371409 (N.D. Cal. May 15, 2009), the court rejected the shareholders' contention that a mutual fund's concentration policy set forth in the fund's prospectus constitutes a contract between the fund and the shareholders. In *Charles Schwab*, the plaintiffs alleged that the fund violated the "contract[]" by amending the concentration policy without shareholder approval. *See id.* at *2. Relying on *McKesson*, the court stated that the prospectus and SAI were "not contracts but rather . . . *mandatory* regulatory disclosure documents." *Id.* at *3. Because of the mandatory nature of such disclosures, the court rejected the shareholders' argument that the disclosures should be "incorporated" into the individual transaction documents that each shareholder received from the mutual fund. *Id.* at *4. Instead, the court applied the rationale of the Ninth Circuit's decision in *McKesson,* holding that the fund's "offering documents under the securities laws are generally different than contract 'offers' (a far narrower concept), and *bare allegations will not equate the two.*" *Id.* at *5 (emphasis added).[9]

---

[8] Notably, Maryland courts often look to Delaware law with regard to matters of corporate law and governance. *See Oliveira*, 130 A.3d at 1093 n.10.

[9] In *Northstar Financial Advisors v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015), a different panel of the Ninth Circuit distinguished its earlier decision in *McKesson* and the District Court's decision in *Charles Schwab*, and found that two policies set forth in a mutual fund's prospectus and SAI – including a concentration policy – could form the basis of an enforceable contract between the fund and the shareholders. However, *Northstar* is inapplicable here because the court's ruling was based on Massachusetts law and, in particular, on the unique aspects of the fund's organizational documents. Specifically, the Ninth Circuit repeatedly pointed out that the Schwab funds were organized as part of a Massachusetts business trust, the underlying documents of which stated that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented to the terms hereof and *to have become a party hereto.*" *Id.* at 1040 (emphasis added). This was of critical importance to the *Northstar* court, which ruled that the trust declaration effectively made the shareholders "parties" to an agreement between the trust and the shareholders. *Id.* at 1040, 1053. No similar allegations are made by the plaintiffs in this action nor could there be, as the subject Fund is organized as a Maryland corporation and does not share these characteristics.

Here, the plaintiffs have pointed to no conduct by the Fund that can be construed as an offer to enter into a contract or any conduct by the shareholders that could be construed as an acceptance.  Indeed, the plaintiffs merely point to the Fund Prospectus and make the conclusory allegation that it "represent[s] an offer by Sequoia to sell shares in the Fund."  Compl. ¶ 45.  However, as the courts in *Oliveira*, *McKesson*, and *Charles Schwab* all have recognized, merely characterizing a disclosure document as an "offering" under the securities laws is insufficient for purposes of pleading an offer under contract formation principles.  Accordingly, the plaintiffs have failed to plausibly allege the fundamental elements of contract formation.

Moreover, the SEC has made clear, both in informational publications and in formal rulemaking, that, unlike proxies and tender offer filings that in many cases solicit shareholder approval, mutual fund disclosures have a very specific informational purpose – and thus do not comprise the terms of a contractually binding "offer."  Specifically, the SEC has recognized that not all mutual fund investors have an interest in reviewing all of the information that is contained in mutual fund disclosures and, therefore, has issued rules that are designed to require that only certain basic information be included in a fund's prospectus, while more detailed information concerning fund policies, governance, and other issues, such as the Concentration Policy at issue here, are set forth in a fund's SAI.[10]  The SEC has stated that "[t]he purpose of the SAI is to provide additional information about the Fund that the Commission has concluded is not necessary or appropriate in the public interest or for the protection of investors to be in the prospectus, but that some investors may find useful."  SEC Form N-1A, at v (Part C.2(b)).

---

[10] *See How to Read a Mutual Fund Prospectus (Part 3 of 3: Management, Shareholder Information, and Statement of Additional Information)*, Secs. & Exch. Comm'n (June 13, 2016), https://www.investor.gov/news-alerts/investor-bulletins/how-read-mutual-fund-prospectus-part-3-3-management-shareholder-infor (stating that the SAI "provides more detailed disclosures [than the prospectus] if [the investor] want[s] more information").

Moreover, in its most recent rules on the subject of mutual fund disclosures, the SEC has made clear that the intended purpose of the overall mutual fund "disclosure regime" is to provide investors with "access to the information [they] need, want, and *choose* to review."[11]  As a result, the SEC has stated that only a summary prospectus need be provided to shareholders, *see* 2009 Final Rule, at 14, and that this summary "should be designed to assist an investor in comparing and contrasting the Fund with other funds," SEC Form N-1A, at v (Part C.1(b)).  The 2009 Final Rule makes clear that a fund's SAI is not even required to be provided to investors – it merely needs to be made available on a mutual fund's website so that those investors who seek detailed fund information may access it.  *See* 2009 Final Rule, at 82.[12]  This disclosure regime is driven, in part, by the SEC's view that such detailed fund information does not need to be provided to potential investors before they decide to invest in the fund.  Indeed, funds are only required to provide a prospectus to investors *after* they have purchased fund shares and, as noted above, are not required to affirmatively provide the SAI, which is the disclosure document at issue here.[13]  Thus, it is illogical to suggest that SAI disclosures comprise the terms of a contractually binding "offer" – which are "accepted" upon an investor's purchase of shares – when the SEC has made clear that investors need not even be provided with an SAI in connection with their purchase.  Accordingly, for this reason as well, the Complaint fails to plausibly allege facts to support a breach of contract claim.

---

[11] *See* Secs. & Exch. Comm'n, Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies ("2009 Final Rule"), 74 Fed. Reg. 4546, at 60 (Jan. 13, 2009), https://www.sec.gov/rules/final/2009/33-8998.pdf (emphasis added).

[12] *See also Information Available to Investment Company Shareholders*, Secs. & Exch. Comm'n (last modified Apr. 15, 2010), https://www.sec.gov/fast-answers/answersmfinfohtm.html (stating that mutual fund must give the SAI to investors upon request).

[13] *See How to Read a Mutual Fund Prospectus (Part 1 of 3: Investment Objective, Strategies, and Risks)*, Secs. & Exch. Comm'n (June 13, 2016), https://www.investor.gov/news-alerts/investor-bulletins/how-read-mutual-fund-prospectus-part-1-3-investment-objective-strateg (explaining that funds are required to provide a prospectus at the latest "with the delivery of fund shares to investors").

## II.   THE PLAINTIFFS HAVE FAILED TO ALLEGE ANY VIOLATION OF THE FUND CONCENTRATION POLICY

Even if the Court were to treat the SAI as a contract for purposes of this Motion, dismissal would still be warranted because the plaintiffs have not alleged any violation of the Fund's Concentration Policy.  The plaintiffs' claim of "breach" is based solely on the contention that beginning in the first quarter of 2015, the Fund's investments in the healthcare industry exceeded the 25% limit set forth in the Concentration Policy.  Compl. ¶¶ 26, 50.  But nowhere does the Complaint allege that the Fund made *purchases* that caused it to exceed the 25% limit. Instead, the Complaint alleges only that the "value" of the Fund's investment in Valeant came to exceed the 25% limit in the first and second quarters of 2015.  *Id.* ¶ 4.  However, the text of the SAI, when read in conjunction with the applicable SEC guidance to which it refers, confirms that the Concentration Policy's 25% limit applies only where the *acquisition* of shares causes the Fund's position to exceed the 25% limit, not to situations in which the position passively increases due to the rise in value of the investment's share price, which is what the plaintiffs allege occurred with Valeant.  *Id.*

The Fund's industry concentration limit provides that the Fund may not concentrate investments in an industry:

> as concentration may be defined under the [ICA] or the rules and regulations thereunder (as such statute, rules or regulations may be amended from time to time) or by guidance regarding, interpretations of, or exemptive orders under, the [ICA] or the rules or regulations thereunder published by appropriate regulatory authorities.

Ex. A, at 3-4.  Thus, the Concentration Policy expressly incorporates SEC regulations or guidance to interpret how the concentration limit applies.  The Complaint acknowledges that the SEC's 1983 Guidelines specifically state that "no further investment may be made in any given industry *if, upon making the proposed investment*, 25 percent or more of the value of the

registrant's assets would be invested in such industry."  1983 Guidelines, 48 Fed. Reg. at 37,962 (emphasis added); *see* Compl. ¶ 24.  The 1983 Guidelines go on to state that "when securities of a given industry come to constitute more than 25 percent of the value of the registrant's assets *by reason of changes in value* of either the concentrated securities or the other securities, the excess need not be sold."  1983 Guidelines, 48 Fed. Reg. at 37,962 (emphasis added).  Here the Complaint alleges that it was an increase in the *value* of the Fund's investment in Valeant that caused the Fund to exceed the 25% limit.  Compl. ¶ 4.  Thus, application of the SEC guidelines flatly defeats the plaintiffs' claim of breach.

Recognizing that application of the 1983 Guidelines bars their claim, the plaintiffs allege that the 1983 Guidelines were "rescinded" by the SEC in 1998.  Compl. ¶ 24.  While it is true that the SEC replaced the 1983 Guidelines with the 1998 Final Rule concerning mutual fund disclosures, the 1998 Final Rule expressly states that the SEC would "continue" to apply its longstanding interpretation of the industry concentration limit set forth in the 1983 Guidelines.  *See* 1998 Final Rule, 63 Fed. Reg. at 13,927, 13,940.  In fact, a footnote in the 1998 Final Rule *explicitly refers back to the 1983 Guidelines* as the source for the SEC's longstanding interpretation.  *See id.* at 13,927 n.99 (stating source of interpretation as "Guide 19 to Form N-1A").

Moreover, there is nothing in the 1998 Final Rule to support the notion that the SEC abandoned its prior interpretation of how the concentration limit is intended to apply.  Specifically, the 1998 Final Rule most assuredly does not adopt the interpretation that Mr. Epstein  advanced in the State Court Action and that the plaintiffs apparently repeat in this Court – *i.e.*, that a fund violates the SEC's concentration limit if the asset exceeds 25% of net assets solely because of an increase in the value of the asset.  Likewise, nothing in the 1998 Final Rule

says that a fund must sell the excess when an asset exceeds 25% of net assets solely due to an increase in value.   Thus, the 1998 Final Rule merely rolls forward the interpretation of concentration limits as set forth in the 1983 Guidelines.

Commentators also agree that the interpretation set forth in the 1983 Guidelines remains intact.  As stated in a leading mutual fund treatise:

> One of the more significant aspects of Section 8(b) [of the ICA] concerns concentration (*i.e.*, an investment of more than 25% of a company's assets in any one industry).  If a company intends to concentrate, its prospectus should identify the industry or group of industries in which it will concentrate . . . .  If a company does not intend to concentrate, it must cease investing in an industry if the proposed investment would cause the company to exceed the 25% limit, *although it need not sell securities if changes in market value alone cause it to exceed this limit*.

1 Thomas P. Lemke, et al., <u>Regulation of Investment Companies</u> § 7.10[2] (Matthew Bender, rev. ed. 2018) (citations omitted) (emphasis added).

Finally, on this issue, application of the plaintiffs' interpretation of the industry Concentration Policy is in conflict with the Fund's policy with regard to a single issuer.  Under that provision, which the plaintiffs do not mention, the Fund may not "[i]nvest more than 25% of the value of its net assets (at the time of purchase and after giving effect thereto) in the securities of any one issuer."  Ex. A, at 4.  It would be nonsensical for the Fund to adopt a *more* restrictive approach applicable to *industry* concentration than to holdings in a single issuer (which, by definition, is always in a single industry and therefore less diversified).   Indeed, under the plaintiffs' illogical interpretation, the Fund's holding in Valeant would *not* violate the single issuer policy because it came to exceed the 25% limit passively by increasing in value but *would be* in violation of the industry policy, thus requiring the Fund to sell Valeant shares in order to get below the 25% limit.  The only way to sensibly read the two policies together is to accept that

both have the same trigger for the 25% limit – an *acquisition* that takes the Fund over that percentage.

Accordingly, for this reason as well, the plaintiffs' Complaint fails to state a claim for breach of contract and should be dismissed.

## <u>CONCLUSION</u>

The Fund respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: New York, New York
July 23, 2018

ROPES & GRAY LLP

By:   ___/s/ Robert A. Skinner_____
          Robert A. Skinner

Robert A. Skinner
Amy D. Roy
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

Lee S. Gayer
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 841-0626
lee.gayer@ropesgray.com

*Attorneys for Defendant Sequoia Fund, Inc.*