**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THOMAS EDWARDS AND MICHAEL
FORTUNE, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Civil Action No. 1:18-cv-04501 (GBD)

Plaintiffs,

**ORAL ARGUMENT REQUESTED**

v.

SEQUOIA FUND, INC., A MARYLAND
CORPORATION,

Defendant.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Robinson Brog Leinwand Greene
Genovese & Gluck P.C.
875 Third Avenue, 9th Floor
New York, NY 10022
Telephone: (212) 603-6300

Keller Rohrback L.L.P.
1201 Third Avenue, Suite 200
Seattle, WA 98101
Telephone: (206) 623-1900

Stanley H. Epstein, Esq.
515 Ocean Avenue, Unit 507N
Santa Monica, CA 90402
Telephone: (310) 393-7619

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     STATEMENT OF FACTS ................................................................... 2

        A.      The Fund and the Concentration Policy Restrictions .......................... 2

        B.      Sequoia exceeds its concentration limit and seeks to excuse its
                conduct by relying on an SEC guidance that had been withdrawn,
                rescinded and disavowed as no longer to be applied to any mutual
                fund registration by the time of its violation. ....................................... 4

III.    ARGUMENT .................................................................................. 5

        A.      Plaintiffs' complaint satisfies the Rule 12(b)(6) standard. ................... 5

        B.      This Court need not analyze choice of law questions because the
                laws of the only possible states at issue do not differ as to the only
                issues now before the Court. ................................................................ 6

        C.      Sequoia chose to adopt a Concentration Policy Restriction that
                incorporates standards set by the SEC and then violated those
                standards. ............................................................................................. 7

                1.      Sequoia relies on language from a 1983 SEC Guide that the
                        SEC rescinded in 1998 and replaced with a guidance that
                        neither explicitly nor implicitly includes any language
                        excusing over-concentration in a single industry's securities
                        merely because it is the result of changes in share price. ......... 7

                2.      Even if it were the place of this Court to second-guess the
                        SEC's 1998 policy decision, that decision is sound. ............... 13

                3.      There is nothing inconsistent between Sequoia's agreement
                        to limit industry concentration and the single issuer
                        limitation stated in paragraph (f)(12) of the Sequoia SAI. ...... 15

                4.      Sequoia's discussion of *dictum* from a state court
                        proceeding is misleading and unpersuasive. ........................... 17

        D.      Plaintiffs have contractual rights that have been breached. ............... 18

IV.     CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*327 Realty, LLC v. Nextel of N.Y., Inc.,*
    55 N.Y.S.3d 202 (N.Y. App. Div. 1st Dep't. 2017) ...............................................10

*Alt. Unlimited, Inc. v New Balt. City Bd. of Sch. Comm'rs.,*
    843 A.2d 252 (Md. Ct. Spec. App. 2004) ...............................................19

*B-Line Med., LLC v. Interactive Dig. Sols., Inc.,*
    57 A.3d 1041 (Md. Ct. Spec. App. 2012) ...............................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................5

*Bucciarelli-Tieger v. Victory Records, Inc.,*
    488 F.Supp.2d 702 (N.D. Ill. 2007) ...............................................11

*Burson v. Capps,*
    102 A.3d 353 (Md. 2014) ...............................................13

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) ...............................................5

*In re Charles Schwab Corp. Sec. Litig.,*
    No. 08-1510, 2010 WL 1463490 (N.D. Cal. Apr. 8, 2010) ...................8, 9, 21, 24

*In re Charles Schwab Corp. Securities Litigation,*
    No. 08-01510, 2009 WL 1371409 (N.D. Cal. May 15, 2009) ...............................................24

*In re Chem. Specialties Mfrs. Ass'n,*
    649 N.E.2d 1145 (N.Y. 1995) ...............................................10

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
    138 S. Ct. 1061 (2018) ...............................................9

*E. Acupuncture, P.C. v. Allstate Ins. Co.,*
    873 N.Y.S.2d 335 (N.Y. App. Div. 2d Dep't. 2009) ...............................................13

*Epstein v Ruane, Cunniff & Goldfarb Inc.,*
    No. 650100/2016 (Sup. Ct. of the State of N.Y., N.Y. County) ...........................17, 18

*Faulkner v. Beer,*
    463 F.3d 130 (2d. Cir. 2006) ...............................................6

*Fernandez v. Windmill Distrib. Co.,*
No. 12-1968, 2016 WL 4399325 (S.D.N.Y. Aug. 17, 2016)....................................6

*Fleming v. Fleming,*
28 N.Y.S.3d 440 (N.Y. App. Div. 2d Dep't. 2016) ...................................13

*Gaston v. Ruiz,*
No. 17-1252, 2018 WL 3336448 (E.D.N.Y. July 6, 2018)....................................5

*I.A. Constr. Corp. v. Equiptec, Inc.,*
622 A.2d 206 (Md. Ct. Spec. App. 1993) ...................................10

*Kasten Const. Co. v. Rod Enters., Inc.,*
301 A.2d 12 (Md. 1973) ...................................13

*Khoja v. Orexigen Therapeutics, Inc.,*
-- F.3d --, No. 16-56069, 2018 WL 3826298 (9th Cir. Aug. 13, 2018)....................................6

*Kolchins v Evolution Mkts., Inc.,*
8 N.Y.S.3d 1 (N.Y. App. Div. 1st Dept, 2015)...................................18

*Kovens v. Paul,*
No. 04-2238, 2009 WL 562280 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 358 F. App'x
228 (2d Cir. 2009)...................................7

*Lapidus v Hecht,*
232 F.3d 679 (9th Cir. 2000) ...................................20, 21

*Leibowitz v Cornell Univ.,*
584 F3d 487 (2d Cir 2009), *superseded by statute on other grounds as
recognized by Vogel v. CA, Inc.,* 662 F. App'x 72 (2d Cir. 2016)...................................19

*Levitin v. PaineWebber, Inc.,*
159 F.3d 698 (2d Cir. 1998)...................................9

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.,*
339 F.3d 1087 (9th Cir. 2003) ...................................21, 23

*Missigman v USI Ne., Inc.,*
131 F Supp. 2d 495 (S.D.N.Y. 2001)...................................19

*Northstar Financial Advisors, Inc. v Schwab Investments.,*
779 F.3d 1036 (9th Cir. 2015) ................................... *passim*

*Oliveira v. Sugarman,*
130 A.3d 1085 (Md. Ct. Spec. App. 2016) ...................................22, 23

*OTG Brands, LLC v. Walgreen Co.*,
  No. 13-9066, 2015 WL 1499559 (S.D.N.Y. Mar. 2015) ........................................................19

*Potomac Capital Mkts. Corp. v. Prudential-Bache Corp. Dividend Fund, Inc.*,
  726 F. Supp. 87 (S.D.N.Y. 1989) ........................................................................................12

*Smith v. Railworks Corp.*,
  No. 10-3980, 2011 WL 2016293 (S.D.N.Y. May 17, 2011) ..................................................6

*Stichting Pensioenfonds ABP v Credit Suisse Group AG*,
  966 N.Y.S.2d 349 (N.Y. Sup. Ct., N.Y. Cty. 2012).............................................................24

*Sutton v. E. River Sav. Bank*,
  435 N.E.2d 1075 (N.Y. 1982)..............................................................................................13

*Taylor v. NationsBank, N.A.*,
  776 A.2d 645 (Md. 2001) ....................................................................................................10

*Trustees of Dartmouth Coll. v. Woodward*,
  17 U.S. 518 (1819)...............................................................................................................21

**Statutes**

Investment Company Act of 1940, 15 U.S.C. § 80 *et. seq.*..................................... *passim*

**Other Authorities**

26 C.F.R. § 1.851-2(c)(2) (2018)..........................................................................................16

17 C.F.R. § 274.11A ...............................................................................................................3

*Registration Form Used by Open-End Mgmt. Inv. Cos.*, 63 Fed. Reg. 13,916-01 at
  13,927 (Mar. 23, 1998) ........................................................................................... *passim*

*BlackRock Multi-Sector Income Tr.*, SEC No-Action Letter, 2013 WL 3477065,
  (July 8, 2013) ....................................................................................................................5, 9

*Invest,* Black's Law Dictionary (10th Ed. 2014) ................................................................12

Investopedia, https://www.investopedia.com/terms/r/rebalancing.asp (last visited
  Aug. 29, 2018) .....................................................................................................................14

Merriam-Webster, https://www.merriam-webster.com/dictionary/invest (last
  visited Aug. 29, 2018)..........................................................................................................12

Merriam-Webster, https://www.merriam-webster.com/dictionary/rebalance (last
  visited Aug. 29, 2018)..........................................................................................................14

*Registration Form Used by Open-End Mgmt. Inv. Cos.,* 8 Fed. Reg. 37,928-02
  (Aug. 22, 1983) .................................................................................................. *passim*

Thomas Lemke, et al., <u>Regulation of Investment Companies</u> (Matthew Bender,
  rev. ed. 2018) .................................................................................................... 10

# I.    PRELIMINARY STATEMENT

Defendant's Motion to Dismiss ("Mot.") should be denied because Plaintiffs' Complaint ("Cplt.") plausibly alleges all the required elements of a contract between themselves and Sequoia: offer, acceptance, and consideration. Plaintiffs contend that Sequoia Fund, Inc. ("Sequoia" or "Fund") chose to limit its own investment discretion, as provided in its Articles of Incorporation, by adopting a fundamental investment policy not to concentrate more than 25% of the Fund's assets in any single industry unless shareholder's approved otherwise. Thus, everyone who purchased or held Fund shares after Sequoia adopted such limitations was entitled to have their investment managed in accordance with its terms, unless shareholders voted to permit otherwise. Sequoia's violation of this limitation in 2015 caused massive losses to its shareholders.

Sequoia relies upon expressly rescinded guidance from the Securities and Exchange Commission ("SEC") in arguing that it was free to hold any amount of its assets in a single industry, as long as it did not make a purchase that alone drove its concentration over 25% or added to those holdings once they exceeded the 25% threshold. This contention is contrary to the plain language of Sequoia's agreement to limit concentration, the controlling guidance from the SEC, and common sense.

Sequoia contends that its agreement to limit its investment discretion cannot constitute an enforceable contract when contained in a mandatory disclosure document like a Registration Statement, which includes a Prospectus and Statement of Additional Information ("SAI"). However, this misstates Plaintiffs' claim and is contrary to the decision of the only Federal Court of Appeals to have considered this issue. Plaintiffs do not contend that every statement contained in an SEC disclosure document automatically constitutes a binding contract. Rather, Plaintiffs contend that Sequoia's voluntary adoption of a fundamental investment policy like the agreement

not to concentrate more than 25% of its investments in a single industry, changeable only by shareholder vote, bound Sequoia to operate the Fund in accordance with its stated investment strategy. The adoption of this investment strategy materially restricted Sequoia's otherwise unfettered powers derived from its Articles of Incorporation. A contractual offer was thereby made by Sequoia to its shareholders that they were entitled to have their investment managed in accordance with its terms, unless and until the shareholders voted to permit otherwise. Shareholders accepted this offer by purchasing or holding shares in the Fund. The consideration for the contract was the shareholder's investment or continued investment in the Fund.

## II.    STATEMENT OF FACTS

### A.    The Fund and the Concentration Policy Restrictions

Sequoia is an open-end investment company (or mutual fund) organized under Maryland law with its principal place of business in New York City. Cplt., ¶¶ 12-13. Sales of the shares of Sequoia's mutual fund can only be made to investors pursuant to a Registration Statement, which includes a Prospectus and SAI, filed with the SEC. *Id.*, ¶ 14. Sequoia is required to operate in accordance with the limitations specified in its governing documents, including the Articles of Incorporation, By-Laws, Registration Statement, SAI, and Prospectus. *Id.*, ¶16.[1]

The Investment Company Act of 1940 (the "ICA") requires each investment company to file a registration statement with the SEC. 15 U.S.C. § 80a-8(a). Among other things, ICA § 80a-8 requires a mutual fund to list in its registration statement all investment policies which are only changeable if authorized by shareholder vote, as well as all policies that the registrant deems matters of fundamental policy. 15 U.S.C. § 80a-8(b)(2) and (3). Any such fundamental policy must be followed at all times "unless authorized by the vote of a majority of [the Fund's]

---

[1] Copies of the Complaint and Articles of Incorporation are attached as Exhibits A and B to the Declaration of Alan M. Pollack ("Pollack Decl.").

outstanding voting securities." 15 U.S.C. § 80a-13(a); Cplt., ¶ 18.

In 1983, the SEC adopted a new form registration statement, Form N-1A, for the registration of open-end investment companies, such as the Fund. *Registration Form Used by Open-End Mgmt. Inv. Cos.,* 8 Fed. Reg. 37,928-02 (Aug. 22, 1983) ("1983 Release"). Cplt. at ¶ 23; 17 CFR 274.11A. The Form N-1A disclosures "are intended to promote effective communication between the Fund and prospective investors." SEC Form N-1A at (v) (General Instructions, (C)(1)(a)) (Pollack Decl., Ex. B).

Pursuant to these requirements, Sequoia adopted certain fundamental investment policies in its Registration Statement, which includes the Prospectus and SAI, (henceforth the "Concentration Policy Restrictions") that:

> The Fund ... may not ... without a stockholder vote of a majority:
> of the outstanding voting securities ... 14. Concentrate investments
> in an industry, as concentration may be defined under the 1940 Act
> or the rules and regulations thereunder (as such statute, rules or
> regulations may be amended from time to time) or by guidance
> regarding, interpretations of, or exemptive orders under, the 1940
> Act or the rules or regulations thereunder published by appropriate
> regulatory authorities.

Cplt. ¶22; Mot. at 5.

Although the ICA does not define "concentrate investments in an industry," Form N-1A reflects the SEC's long held view that "25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk," and thus "a fund investing more than 25% of its assets in an industry is concentrating in that industry." Form N-1A at 11 (Item 9, Instr. 4); Cplt., ¶23. *See, also, Registration Form Used by Open-End Mgmt. Inv. Cos.,* 63 Fed. Reg. 13,916-01 at 13,927 (Mar. 23, 1998) ("1998 Release").

By voluntarily adopting these Concentration Policy Restrictions, Sequoia agreed to follow two restrictions on the powers conferred by its Articles of Incorporation: *First*, it would

not concentrate its investments in any one industry in excess of 25% of its net assets; and

*Second*, it would not deviate from this policy without a shareholder vote. Cplt., ¶21.

### B. Sequoia exceeds its concentration limit and seeks to excuse its conduct by relying on an SEC guidance that had been withdrawn, rescinded and disavowed as no longer to be applied to any mutual fund registration by the time of its violation.

By the first quarter of 2015, the Fund's holdings in healthcare industry stocks exceeded 25%, and those holdings stayed above 25% through at least September 2015. Cplt., ¶ 26. Despite this, Sequoia never took any action to reduce its holdings of these stocks. *Id.*, ¶ 27. The risk of overinvestment in a single industry became manifest when the price of the healthcare company Valeant collapsed starting in late 2015, causing shareholders to suffer massive losses. *Id.*, ¶ 29.

Defendant takes the position that holding over 25% of its assets in healthcare stocks did not violate its promise not to over-concentrate investments because it never actually ***added*** to those holdings after they exceeded 25%. Mot., at 7. This position—that only purchases and not increases in share price (or other valuation changes) can cause a fund to be in violation of a promise not to over-concentrate investments —relies on an SEC Guide that was rescinded 17 years before the conduct at issue here. *Id.* at 6 (quoting "1983 Release"); Cplt., ¶ 24.

In 1983, when the SEC adopted Form N-1A, it issued "Guides" providing staff opinions and interpretations to assist registrants with filling out Form N-1A. These Guides "are not rules of the [SEC] and … represent the views of the staff of the Division of Investment Management rather than an official position of the Commission." 1983 Release, 48 Fed. Reg. at 37,958.

In 1998, the SEC adopted new amendments to Form N-1A. 1998 Release, 63 Fed. Reg. 13,916. The SEC instructed that it was not republishing the 1983 Guides with the 1998 amendments. Rather, the SEC announced that the 1983 Guides were not to be used henceforth and that the Guides and prior Guide Releases were rescinded:

The Guides have not been republished with Form N-1A, as amended. Neither the Guides nor the GCLs will apply to registration statements prepared on the amended Form. The Commission also is rescinding the Guides Releases[.][2]

1998 Release, 63 Fed. Reg. at 13,940 n. 214 (GCLs refers to SEC Generic Comment Letters).

The 1998 Release replaced the convoluted discussion of the 1983 Guide 19 (which spanned 50 lines of small type) with a simple and unambiguous requirement that a mutual fund had to "[d]isclose any policy to concentrate in securities of issuers in a particular industry or group of industries (i.e. investing more than 25% of a Fund's net assets in a particular industry or group of industries)." *Id.* at 13,951 (Item 4(b)(1)4). No part of abandoned Guide 19 was incorporated into the 1998 Release beyond the SEC's re-adoption of the 25% cutoff for concentration, which the SEC explained is the only aspect of former Guide 19 that "[t]he Commission continues to believe . . . [and] [t]herefore . . . is adopting[.]" *Id.* at 13,927.

## III. ARGUMENT

### A. Plaintiffs' complaint satisfies the Rule 12(b)(6) standard.

A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a motion to dismiss, the court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

"When considering a Rule 12(b)(6) motion to dismiss, the court may consider only . . . 'the facts alleged in the complaint,' . . . documents that are 'integral' to the complaint, in that the complaint 'relies heavily on their terms and effect,' so long as these documents are undisputedly authentic and accurate [and] public records of which the court could take judicial notice." *Gaston*

---

[2] In 2013 the SEC reiterated that the 1983 Release had been rescinded. *BlackRock Multi-Sector Income Tr.*, SEC No-Action Letter, 2013 WL 3477065, at *2 n.4 (July 8, 2013).

*v. Ruiz*, No. 17-1252, 2018 WL 3336448, at *2 (E.D.N.Y. July 6, 2018) (quoting and citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). To be considered it must also be that "there exist[s] no . . . dispute . . . regarding the relevance of the document." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d. Cir. 2006). Defendant bases its argument on a revoked 1983 SEC Guide which is not integral to Plaintiffs' Complaint, and whose relevance as a revoked statement by the SEC is certainly disputed. Indeed, information relating to a defense is never integral to a complaint, only materials related to the claims. *Fernandez v. Windmill Distrib. Co.*, No. 12-1968, 2016 WL 4399325, at *3 (S.D.N.Y. Aug. 17, 2016) (recognizing that extrinsic evidence that is only relevant to a defense can only be considered by converting the motion to one for summary judgment and declining to do so) (citing *Mitchell v. Drew*, 154 F. App'x. 235, 237 (2d Cir. 2005)).[3] This 1983 Release - expressly abandoned by the SEC in 1998 - should not be considered by the Court as part of a challenge to the face of the complaint.

**B.     This Court need not analyze choice of law questions because the laws of the only possible states at issue do not differ as to the only issues now before the Court.**

Sequoia and Plaintiffs agree that "the common law elements of contract formation . . . are identical in both Maryland and New York." Mot. at 11-12, *infra* Section III(D). Further, as Plaintiffs show below, there is also no difference between the rules of these two states' laws regarding contract interpretation at issue at this time, *see infra* n. 13, or regarding statutory or regulatory interpretation. *Infra* n. 14. As such, it makes no difference to any claim in Plaintiffs' Complaint whether New York or Maryland law applies. Further, "[b]ecause a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage." *Smith v. Railworks Corp.*, No. 10-3980, 2011 WL 2016293, at *6 n. 12

---

[3] *See, also Khoja v. Orexigen Therapeutics, Inc.*, -- F.3d --, No. 16-56069, 2018 WL 3826298, at *10 (9th Cir. Aug. 13, 2018) (analyzing why documents only relevant to a defense to a complaint cannot be considered on a motion to dismiss).

(S.D.N.Y. May 17, 2011).[4] As such, this Court need not engage in any choice of law analysis at this point, and Plaintiffs show below that their claim is adequately pled under either states' law.

## C. Sequoia chose to adopt a Concentration Policy Restriction that incorporates standards set by the SEC and then violated those standards.

Sequoia does not dispute that over 25% of its net assets were invested in health care industry stocks for approximately nine months during 2015. Mot. at 6-8. Instead, it claims that this over-concentration in a single industry was allowed by its Concentration Policy Restrictions because it never bought *additional* healthcare securities during the time it was over concentrated. *Id.* at 8. This is contrary to the plain language of the Concentration Policy Restrictions, of SEC Form N-1A and of the 1998 Release that was integrated into the Policy Restrictions by reference. Sequoia's effort to rely on a rescinded 1983 statement by the SEC that had not been in effect since 1998 cannot succeed. While the plain language of the SEC guidance alone is enough to resolve this issue, there is also no truth supporting Sequoia's argument that there is an inconsistency between Sequoia's policies regarding excessive concentration in securities of a single issuer and excessive concentration in a single industry. Each addresses a different regulatory and statutory requirement, and the two policies can easily be reconciled.

### 1. Sequoia relies on language from a 1983 SEC Guide that the SEC rescinded in 1998 and replaced with a guidance that neither explicitly nor implicitly includes any language excusing over-concentration in a single industry's securities merely because it is the result of changes in share price.

Sequoia's Concentration Policy Restrictions state that:

> The Fund may not [without shareholder approval]: . . . 14. Concentrate investments in an industry, as concentration may be defined under the 1940 Act or the rules and regulations thereunder (as such statute, rules or regulations may be amended from time to

---

[4] Plaintiffs disagree that the internal affairs doctrine is applicable here, because this is not a dispute about a corporation's internal affairs. *See Kovens v. Paul*, No. 04-2238, 2009 WL 562280, at *3 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 358 F. App'x 228 (2d Cir. 2009) (internal affairs doctrine inapplicable to breach of contract action). But since New York and Maryland law do not differ in any relevant way, there is no need to address this doctrine now.

time) or by guidance regarding, interpretations of, or exemptive orders under, the 1940 Act or the rules or regulations thereunder published by appropriate regulatory authorities.

Cplt ¶22. Sequoia contends that as long as it did not actually add to its overinvestment in healthcare stocks during 2015, then holding over 25% of its net assets in such securities was not a violation of its Concentration Policy Restriction. This contention contradicts any rational interpretation of Sequoia's chosen language. The only basis Sequoia cites for its strained assertion, is language that is found in an SEC Guide issued in 1983. Mot. at 19 (quoting language from Guide 19 of the 1983 Release). But that Guide was rescinded in 1998 with an express direction from the SEC that it was not to be used henceforth.

        a.      **The 1983 Guide 19 has been rescinded, and the 1998 Release does not adopt any part of that Guide except "that 25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk."**

A fatal flaw in Sequoia's position is that it ignores the plain language of the guidance issued by the SEC in 1998, where the SEC expressly stated that it was not republishing the Guides with the amended Form N-1A. Any prior Guides were to be deemed no longer published, any prior Guide was not to "apply to [any] registration statement" thereafter, and "[t]he Commission … is rescinding the Guides Releases." 1998 Release, 63 FR 13916-01 at *13,940, n. 214 ("The Guides have not been republished with Form N-1A, as amended. Neither the Guides nor the GCLs will apply to registration statements prepared on the amended Form. The Commission also is rescinding the Guides Releases[.]")

Both the SEC and the courts have subsequently expressly recognized that the 1998 Release rescinded the Guides that accompanied the 1983 Release, including specifically Guide 19. For example, Judge Alsup of the Northern District of California recognized that "Guide 19 [from the 1983 Release] was withdrawn in 1998." *In re Charles Schwab Corp. Sec. Litig.*, No.

08-1510, 2010 WL 1463490, \*5, n.5 (N.D. Cal. Apr. 8, 2010). At issue in that case was whether Schwab had properly defined the scope of the industry to which it claimed it was limiting its investments to less than 25%. The court recognized that Guide 19 of the 1983 Release included statements about how to define the scope of an industry which Schwab argued excused its conduct. It was, therefore, significant that Guide 19 had been revoked so that Schwab could not rely on what the revoked Guide stated about how to define an industry for purposes of a concentration policy.[5] Further, in 2013 the SEC confirmed its own earlier statement about the status of the 1983 Release when it issued a "No-Action Letter" to BlackRock Trust. *BlackRock Multi-Sector Income Tr.*, 2013 WL 3477065 (July 8, 2013). That letter includes a citation, in footnote 4, to "Investment Company Act Rel. No. 13436 (Aug. 12, 1983) (*rescinded*)." *Id.* at \*2, n.4 (emphasis added).[6]

Contrary to Sequoia's suggestion, footnote 99 of the 1998 Release does not act to incorporate by reference and preserve the entirety of Guide 19 of the 1983 Release.[7] This can be seen by reading the actual text to which footnote 99 attaches. That text reads: "The Commission's staff *has taken* the position for purposes of the concentration disclosure requirement that a fund investing more than 25% of its assets in an industry is concentrating in that industry. [FN 99]." 1998 Release, 63 FR 13916-01 at 13,927 (emphasis added). This is an entirely backwards-looking statement, and the footnote merely serves to indicate where one can

---

[5] In addition to noting that the 1983 Guide could not help Schwab because it was revoked, the court also found that even if the 1983 Guide had still applied, Schwab's conduct would not have been excused by that guidance.

[6] As a public record of a federal agency, the Court can consider this No-Action letter. *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 701-03 (2d Cir. 1998) (considering multiple SEC no-action letters in ruling on motion to dismiss).

[7] It should be noted that the text of the 1983 Guide 19 comprises 50 lines of text (1983 Release, 48 FR 37918-02 at 37962). In contrast, the 1998 Release which limits its incorporation of Guide 19's disclosure requirements to the 25% benchmark, comprises just 3 lines. 1998 Release, 63 FR 13916-01 at 13927 and 13951. While not directly on point, one is reminded of the Supreme Court's admonition that "Congress does not hide elephants in mouseholes." *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018). If in 1998 the SEC wanted to maintain the significant exception (one might say loophole) to the 25% rule that existed in 1983, it would have added the sentence Sequoia quotes from the 1983 Guide 19 to Item 4 (or at least to the discussion of Item 4).

find a statement of that ***prior*** position. The text of the 1998 Release then continues, noting (a) that the 25% cutoff had been "incorporated . . . into Form N-1A," (b) that commentators had indicated that they continue to believe that disclosing any industry concentration policy is appropriate, and (c) that "the Commission continues to believe that 25% is an appropriate benchmark to gauge the level of investment concentration that could expose investors to additional risk." *Id.* Other than carrying forward and incorporating the 25% benchmark, no other aspect of Guide 19 was incorporated. Sequoia is simply wrong when it suggests that a mere reference to Guide 19 in footnote 99 means that everything within those earlier rescinded and withdrawn guidelines about concentration was being readopted in 1998. The SEC explains the one and only part of Guide 19 that it is readopting—the 25% cutoff—and nowhere indicates that it is adopting any other aspect of its prior guidance.[8]

Finally, even if the Court considers the 1983 Guides (even though not integral to the complaint but to a defense) and their relevance is challenged, at best the SEC statements listed above are unclear and ambiguous. Since Sequoia chose to integrate those standards into its offer, under standard contract construction principles, any such ambiguity must be construed against Sequoia as drafter. *327 Realty, LLC v. Nextel of N.Y., Inc.*, 55 N.Y.S.3d 202 (N.Y. App. Div. 1st Dep't. 2017); *I.A. Constr. Corp. v. Equiptec, Inc.*, 622 A.2d 206, 208 (Md. Ct. Spec. App. 1993).

Sequoia derives no additional help from an unsupported opinion of the authors of Thomas Lemke, et al., Regulation of Investment Companies (Matthew Bender, rev. ed. 2018) (quoted in Mot. at 20). Sequoia quotes three sentences from this publication, highlighting the part of the last quoted sentence that it wishes this Court to follow (which essentially just re-states

---

[8] *In re Chem. Specialties Mfrs. Ass'n*, 649 N.E.2d 1145, 1151 (N.Y. 1995) ("a court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which [is not there]. Also, an inference must be drawn that what is omitted or not included was intended to be omitted and excluded.") (citations omitted); *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 654 (Md. 2001) (same).

the language of the revoked and withdrawn 1983 Guide 19). Sequoia's Motion provides a

citation indicating the source of the three quoted sentences, to which it adds parentheticals that

read: "(citations omitted) (emphasis added)." Mot. at 20. Sequoia thereby creates the misleading

impression that there are supporting citations for *all* the quoted material including, in particular,

the sentence fragment that Sequoia highlights. This Court should not be misled by this sleight of

hand. The truth is that Lemke et al. only provide supporting authority for the *first* of the three

sentences quoted by Sequoia, a sentence that simply reports that the SEC has determined that

25% is the cutoff for defining industry concentration. For that proposition, the authors cite to the

1998 Release. *See* Lemke, *supra,* §7.10[2] at n.8 and accompanying text. But as to the sentence

fragment that Sequoia highlights and wishes the Court to follow, that sentence is ***unsupported by

any citation,***[9] and therefore represents nothing more than the unsupported opinion of the authors.

Finally, to the extent Sequoia has cited Lemke et al., not as a supporting legal authority,

but instead to illustrate industry standards, this is improper, and the Court should not consider

this reference at all. *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F.Supp.2d 702, 708 (N.D.

Ill. 2007) (publication which purports to state the industry standard of practice "cannot be

considered on [a] motion [to dismiss] without converting it to a motion for summary judgment

under Rule 12(c).")

> **b.** **The plain language of the 1998 Release includes no exception for excessive concentration that is the result of changes in share price.**

Having established that the 1998 Release revoked the 1983 Guide 19 and then separately

readopted the 25% benchmark, this Court need only consider the plain language of the 1998

Release. In 1998, the sum total of what the SEC had to say about industry concentration was

---

[9] Plaintiffs attach a copy of the relevant section from the Lemke et al. publication as Exhibit C to the Pollack Decl. so that the Court can see for itself how Sequoia has misrepresented what parts of the material quoted by Sequoia are actually supported by citation and what parts are simply unsupported opinions of the authors.

"that 25% is an appropriate benchmark to gauge the level of investment concentration that could

expose investors to additional risk," 1998 Release, 63 FR 13916-01 at 13,927, and therefore the

"Instructions" for filling out form N1-A required that a fund: "Disclose any policy to concentrate

in securities of issuers in a particular industry or group of industries (i.e. investing more than

25% of the Fund's net assets in a particular industry or group of industries.") *Id.* at 13,951 (Item

4(b)(1)4); Form N-1A. A plain reading of both provisions can have only one reasonable

interpretation: that at no time could a mutual fund hold more than 25% of its net assets in a

single industry's stocks.[10] No reasonable person could possibly read these provisions otherwise.

The key and controlling phrase in the 1998 Release is "investing more than 25% of the Funds'

net assets," and this cannot be read to mean anything other than "holding more than 25% . . ."

Certainly, there is no possible reading of this phrase that a reasonable person would understand

means: "purchasing but only purchasing when you are already holding more than 25% . . .,"[11]

which is what Sequoia claims the SEC meant by this phrase.

It is important to note, in this regard, that no mutual fund is required to follow the SEC

industry concentration policy. Many funds specialize in managing certain types of assets,

including specializing in investing in a single industry.[12] *See, e.g., Potomac Capital Mkts. Corp.

v. Prudential-Bache Corp. Dividend Fund, Inc.,* 726 F. Supp. 87, 88 (S.D.N.Y. 1989) (quoting

the fundamental investment policy of the fund at issue as requiring that it generally invest "*at*

---

[10] *See, Invest,* BLACK'S LAW DICTIONARY (10th Ed. 2014) (defining "invest" as: "To apply (money) for profit"); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/invest (last visited Aug. 29, 2018), (defining "invest" as "to commit (money) in order to earn a financial return."). Both definitions map into the concept of "holding a certain amount of money in an asset" and have nothing to do with the act of purchasing, which is how Sequoia interprets the word "investing."

[11] Sequoia's reading is actually even more complicated than this. According to Sequoia, the phrase means "purchasing but only when your purchase will result in you holding more than 25% ...." It hardly needs belaboring that this cannot be reconciled with *any* possible plain reading of words that appear in the 1998 Release.

[12] Those funds do not include anything like the promise to limit concentration at issue here. Indeed, as illustrated by the quoted material below, some of these funds tend to include the exact opposite promise, never to invest *less* than some give percentage in the preferred asset category.

*least* 65% of its total assets … in adjustable rate preferred stocks" and that "the Fund will concentrate *at least* 25% of its total assets in the securities of bank holding companies….") (emphasis added). People who invested in Sequoia had many other options including buying a healthcare-focused fund or other specialized funds and elected not to do so, but instead decided to invest in a fund that agreed to follow a strategy not to over-concentrate its investments in any single industry.

2.      **Even if it were the place of this Court to second-guess the SEC's 1998 policy decision, that decision is sound.**

It is not the place of this Court to second-guess SEC policy decisions or impose its own policy preferences. Rather this Court is required to apply the plain language of the contract[13] and of the relevant 1998 Release.[14] The SEC's explanation why a concentration cutoff is required shows the reasons its 1983 Guide 19 made no sense and was rescinded. It is perfectly logical that in 1998 the SEC removed the illogical exception it wrote into its 1983 Guide 19, requiring instead that a fund disclose any level of "investment concentration [over 25% because] that could expose investors to additional risk," 1998 Release, 63 FR 13916-01 at 13,927, no matter how it came to be that the fund was overexposed to the risks arising from excessive investment in a single industry.

It cannot be gainsaid that investors are exposed to exactly the same degree of "additional risk" if a fund has over 25% invested in a single industry no matter when it bought those shares.

---

[13] *Fleming v. Fleming*, 28 N.Y.S.3d 440, 441 (N.Y. App. Div. 2d Dep't. 2016) (contracts are interpreted to ensure that "the parties' . . . reasonable expectations will be realized" and "[t]he words and phrases used in an agreement must be given their plain meaning[.]"); *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) ("the words of the contract [must be given] their fair and reasonable meaning" and contemplate what "a reasonable person in the position of the [parties] would be justified in understanding were included") (citations omitted); *Kasten Const. Co. v. Rod Enters., Inc.*, 301 A.2d 12, 18 (Md. 1973) (the plain language of the contract governs, read to give effect to "what a reasonable person in the position of the parties would have thought it meant.")

[14] *E. Acupuncture, P.C. v. Allstate Ins. Co.*, 873 N.Y.S.2d 335, 340 (N.Y. App. Div. 2d Dep't. 2009) (language of a regulation is to be given its plain meaning); *Burson v. Capps*, 102 A.3d 353, 363 (Md. 2014) (same).

It simply makes no sense, given the rationale for the SEC disclosure rule, to argue that over-concentration is sometimes allowed and sometimes not, based simply on the arbitrary historical quirk of when shares were purchased. What matters for risk exposure to the shareholders is whether, at *any* particular point in time, the portfolio is overexposed to the risks of a single industry. That is what determines the degree of "additional risk" that concerned the SEC, and hence, the 1998 rule makes sense in a way the 1983 rule never did. There is certainly nothing difficult about implementing the 1998 Release. This merely requires rebalancing of the portfolio when holdings go above 25%, a standard practice recommended to any investor.[15]

To underscore the absurdity of Sequoia's position, consider that in December of 2014 Sequoia held 11,320,000 shares of Valeant worth $320,242,800, accounting for 9.2% of the Fund's total net assets. Sequoia's Concentration Policy Restrictions would have permitted it to have purchased two-and-a-half times this many Valeant shares (i.e. over 27 million shares) at that time, because that would still have left Sequoia with less than 25% of its assets held in healthcare stocks.[16] Sequoia claims that by June of 2015, when 27 million Valeant shares would have been worth over $4.5 billion, well over 2/3 of Sequoia's net assets, its Concentration Policy Restrictions would not have required it to divest *any* of those holdings because it was never required to sell appreciated health-care stocks, just not buy any additional stocks at that point. But no rational or reasonable fund investor (or anyone reading Sequoia's Concentration Policy Restrictions) would ever have believed that a promise to never invest more than 25% of its assets

---

[15] *See*, Investopedia, https://www.investopedia.com/terms/r/rebalancing.asp (last visited Aug. 29, 2018) ("Rebalancing is the process of realigning the weightings of a portfolio of assets. Rebalancing involves periodically buying or selling assets in a portfolio to maintain an original desired level of asset allocation. ... Rebalancing gives investors the opportunity to sell high and buy low, taking the gains from high-performing investments and reinvesting them in areas that have not yet experienced such notable growth."); Merriam-Webster, https://www.merriam-webster.com/dictionary/rebalance (last visited Aug. 29, 2018), (defining "rebalance" as "to buy and sell assets of (an investment portfolio) in order to regain a desired allocation of those assets.")

[16] Sequoia did have small investments in a handful of health care industry stocks other than Valeant, but even adding those stocks would keep Sequoia's health-care investments below 25% had it bought 25 million Valeant shares.

in a single industry meant that it was acceptable for Sequoia to passively sit on a position in an industry that appreciated in value to the point where the Fund was 2/3 concentrated in that industry stocks. Indeed, Sequoia's argument has no logic or limit. Sequoia would have this Court rule that a fund can hold 95% of its net assets in the stocks of a single industry, yet not be in violation of an industry Concentration Policy Restrictions as long as it does not actually add to the number of shares held in that industry. No possible interpretation of any words in Sequoia's policy or in the SEC 1998 Release contemplates such an absurdity.

3.     **There is nothing inconsistent between Sequoia's agreement to limit industry concentration and the single issuer limitation stated in paragraph (f)(12) of the Sequoia SAI.**

Sequoia distracts the Court by referring to a completely different limitation on investment stated in its SAI, suggesting that Plaintiffs' understanding of what Sequoia states about its agreement to limit industry concentration would be "nonsensical" in light of this other restriction which limits the amount the Fund can invest in the shares of a single company. Mot. at 20 (referring to paragraph (f)(12) of the SAI, which states that: "The Fund may not . . . [i]nvest more than 25% of the value of its net assets (at the time of purchase and after giving full effect thereto) in the securities of any one issuer.") Sequoia is wrong factually, legally, and as a matter of logic.

First, Sequoia fails to inform the Court that there are tax consequences associated with a fund holding over 25% of its assets in shares of a single issuer that do not arise from excessive concentration in an industry. Unlike the restriction on industry concentration at issue here, as stated in paragraph (f)(14) of the Sequoia SAI, the limitation described in paragraph (f)(12) of the SAI is not a limitation required to be disclosed to shareholders by the SEC. Instead, this limitation arises from the tax code. This is explained elsewhere in the Sequoia SAI in a section titled "Tax Considerations." That Section informs investors that:

The Fund is a "non-diversified" investment company, which means the Fund is not limited (*subject to the investment restrictions set forth above*) in the proportion of its assets that may be invested in the securities of a single issuer. However, . . . the Fund intends to conduct its operations so as to qualify, to be taxed as a "regulated investment company" for purposes of the Internal Revenue Code of 1986, as amended, (a "RIC") . . . To so qualify, among other requirements, the Fund will limit its investments so that, at the close of each quarter of the taxable year, (i) not more than 25 percent of the market value of the Fund's total assets will be invested in the securities of a single issuer ("the 25% test") . . . *The Fund will not lose its status as a RIC if the Fund fails to meet the 25% test . . . at the close of a particular quarter due to fluctuations in the market values of its securities.*

Sequoia SAI (May 1, 2015 as amended October 29, 2015) (attached as Exhibit A to the Gayer Declaration (ECF No. 20-1)) at 15 (emphasis added).

What this paragraph makes clear is that for tax purposes it is important that the Fund not *purchase* shares *in any individual issuer* at a time when such a purchase would push the Fund over 25% concentration *in that single issuer's* shares. But for tax purposes, exceeding a 25% investment in a single issuer solely because its shares have appreciated in value (or other holdings have declined) does not jeopardize any tax status. *See*, 26 C.F.R. § 1.851-2(c)(2) (2018). This is why paragraph (f)(12) of the SAI exists: to inform investors of how Sequoia will operate in a manner designed to keep its tax status. That the IRS has a different standard than the SEC does not render paragraphs (f)(12) and (f)(14) of the SAI inconsistent with one another.

Furthermore, the addition of the language "subject to the investment restrictions above" in the "Tax Considerations" section of the SAI (quoted above) makes clear that if investments in a single stock causes Sequoia to violate provision (f)(14) (the industry concentration policy), then that concentration policy (which relates to holdings at a point in time, not to time of purchase) supersedes the more lax restrictions imposed by the tax code. So there is nothing inconsistent, let alone "nonsensical" in provisions (f)(12) and (f)(14) both being in the SAI.

Finally, Plaintiffs note that the presence of the additional language regarding "at the time

of purchase" in paragraph (f)(12) cuts against Sequoia's position regarding the industry concentration limitation stated in (f)(14). The presence of this limiting language in paragraph (f)(12) demonstrates that Sequoia knows how to state such a limitation expressly, and that it chose not to include any such limiting language in its limit on industry concentration.

### 4. Sequoia's discussion of *dictum* from a state court proceeding is misleading and unpersuasive.

While Sequoia does not refer to it in its argument, it misleadingly quotes from *dictum* from a hearing transcript in a prior state court derivative case,[17] suggesting that the state court considered the merits of the concentration policy claim. Mot. at 9-10 (quoting "fool's errand" language responding to query regarding leave to amend the complaint). Again, Sequoia is wrong, and it fails to inform the Court of all the relevant facts.[18]

The Order in *Ruane*[19] could not be clearer that: "The First Amended Complaint is hereby ordered DISMISSED for failure to make a pre-suit demand on the Fund ...." *Ruane* Order, Feb. 27, 2017.[20] As such, even if the language Sequoia quotes did relate to the *Ruane* court's evaluation of any issue regarding the merits, it is *dictum*.

But worse than this, Sequoia quotes this off-hand statement by the *Ruane* court without

---

[17] *Epstein v Ruane, Cunniff & Goldfarb Inc.*, No. 650100/2016 (Sup. Ct. of the State of N.Y., N.Y. County).

[18] Sequoia's *ad hominem* attacks on Mr. Epstein are an inappropriate distraction and unfair attempt to impugn his professional character, divert the Court from its flawed Motion, and are unworthy of a response. As Sequoia concedes the claim in this lawsuit is different from the claims in *Ruane*, Mot. at 3, and therefore Mr. Epstein's representation of Sequoia shareholders in this action presents no conflict of interest or other ethical concern.

[19] Plaintiffs attach a copy of this Order, and the accompanying transcript as Exhibit D to the Pollack Declaration. Sequoia refers the Court to these materials without providing a copy allowing the Court to read what the *Ruane* court actually said including in its final Order which expressly contradicts the material quoted by Sequoia.

[20] *See, also,* Transcript of February 15, 2017 hearing in *Ruane* (attached to Order) at 69:2-8 (THE COURT: "And so at the bottom line the plaintiffs have failed to allege demand futility and the motion is dismissed for failure to make the demand must be granted. [sic] The Court need not address the remaining issues ... because they're quite frankly, moot, given the decision with respect to the demand futility."); *id.* at 5:13-24 (THE COURT: "[T]he first question is the demand futility question. I suppose if that gets resolved against the plaintiff, all the other, claims are moot[.] I would like ... to focus on ... the demand futility question, because ... if that is resolved against the plaintiff, that at least for the moment, that's the end of the case."); *id.* at 48:11-14 (counsel for the *Ruane* defendants (also counsel for Sequoia here) explaining that "demand futility is a predecessor argument" to any argument "on the merits."); *id.* at 48:19-49:1 (Ruane counsel explaining why the court need not reach the merits).

also informing this Court that the *Ruane* court issued an Order instructing that "[d]ismissal is *without prejudice* to any right plaintiffs may have . . . to seek to amend the [] complaint." *Id.* (emphasis added). Sequoia also fails to make clear that the "fool's errand" comment, Tr. 70:24-25, was made in the context of that court's repeated explanation that its ruling was based on the fact that the *Ruane* plaintiffs "didn't take the predicate step . . . to make the demand of the corporation." Tr. 70:9-10. Given that the *Ruane* court's actual order *did* grant the plaintiffs leave to amend, the comment Sequoia relies upon should carry no weight. Moreover, based on its context, the comment appears simply to be another acknowledgement by the *Ruane* court that any amendment to add material that related to the merits of the claim was "a fool's errand" because the case was dismissed on the basis of a predicate requirement—failure to plead demand futility—not on the merits.

## D.     Plaintiffs have contractual rights that have been breached.

Both Maryland and New York follow substantially similar contract formation principles. In Maryland, the elements of a contract are "offer, acceptance, and consideration." *B-Line Med., LLC v. Interactive Dig. Sols., Inc.*, 57 A.3d 1041, 1055 (Md. Ct. Spec. App. 2012). In New York, "[t]o establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kolchins v Evolution Mkts., Inc.*, 8 N.Y.S.3d 1, 4 (N.Y. App. Div. 1st Dept, 2015) (citation omitted). When viewed in light of contract law principles, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (alteration in original) (*citing* Restatement (Second) of Contracts § 24 (1981)).

Maryland and New York also recognize implied contracts. Under New York law, "[a] contract implied in fact may result as an inference from the facts and circumstances of the case,

although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Leibowitz v Cornell Univ.*, 584 F3d 487, 506-07 (2d Cir 2009), *superseded by statute on other grounds as recognized by Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016) (citations omitted). A contract implied in fact is as binding as one that is express, and similarly requires such elements as offer, consideration and mutual assent; *OTG Brands, LLC v. Walgreen Co.*, No. 13-9066, 2015 WL 1499559, at *6 (S.D.N.Y. Mar. 2015). Under New York law, an implied-in-fact contract is "just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Missigman v USI Ne., Inc.*, 131 F Supp. 2d 495, 512 (S.D.N.Y. 2001) (citation omitted).

Similarly, in Maryland, a contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Alt. Unlimited, Inc. v New Balt. City Bd. of Sch. Comm'rs.*, 843 A.2d 252, 289 (Md. Ct. Spec. App. 2004) (citations omitted). The only distinction between express and implied contracts is not the existence of the contract itself but "the modality of its proof." *Id.* at 295.

Here, whether viewed as express or implied, Plaintiffs have established each element of a contract. Once Sequoia chose to adopt such a policy, its fundamental investment objective became mandatory and binding on Sequoia. Specifically, the Concentration Policy Restrictions contains two restrictions on the powers conferred to Sequoia under its ByLaws and Articles of Incorporation: Sequoia agreed *First* that it would not concentrate its investments in any one industry in excess of 25% of its net assets; and *Second*, that it would not deviate from this policy without a shareholder vote. Once adopted and disseminated by Sequoia in its Registration

Statement and SAI, these restrictions amounted to Sequoia's offer to its shareholders, that it would manage their investments according to the terms and conditions of its Concentration Policy Restriction and would only change this strategy by shareholder vote. Plaintiffs and other members of the Class accepted Sequoia's offer when they purchased and/or continued to hold their shares in Sequoia during the Relevant Class Period. Cplt., ¶ 46. The consideration for the contract was the shareholders' investment, or continued investment, in the Fund.

The existence of a contract under facts indistinguishable from those present here has already been found by the Ninth Circuit Court of Appeals in *Northstar Financial Advisors, Inc. v Schwab Investments.*, 779 F.3d 1036 (9th Cir. 2015).[21] Exactly as here, Schwab stated as a "fundamental investment objective[] . . . that it not over-concentrate its investments in any one industry[, an] objective[] which could only be changed by a vote of the shareholders[.]" *Id.* at 1039. This policy was stated in Schwab's Registration Statement (Form N-1A) and SAI, *id.* at 1041, just as Sequoia's fundamental Concentration Policy Restriction is stated in its Form N-1A and SAI. Recognizing that "it is not necessary to characterize the contract here as either express or implied" the *Northstar* court found that an 1819 decision of the United States Supreme Court and its own prior decision in *Lapidus v Hecht,*, 232 F.3d 679 (9th Cir. 2000) decided the question, and found the existence of "a contractual right [for fund shareholders] to have the Fund managed in accordance with [the fundamental investment] objectives" because those objectives could only be changed by shareholder vote. *Id.* at 1051-52 (citing *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819)). As the *Northstar* court explained,

> The prospectus . . . is the primary selling document[] offer[ing] to sell shares to investors in a mutual fund which will invest the proceeds in the manner described in the prospectus . . . [and] the purchase of . . . shares [in the fund] constitutes an

---

[21] The Honorable Edward R. Korman, Senior District Judge for the United States District Court for the Eastern District of New York, sitting by designation wrote the Ninth Circuit's opinion. Plaintiffs also note that this case is currently before the Ninth Circuit again, albeit on an issue irrelevant to this Motion.

acceptance of the offer by the investor. . . . The consideration for the contract was the shareholders' investment, or continuing investment, in the Fund. . . . The conduct of the parties thus fulfills all the requirements for a binding contract[.]

*Id.* at 1054-55.

In its Motion at 15, n.9, Defendant argues unpersuasively that *Northstar* is inapplicable to this case because that court relied on the fact that the Schwab funds were organized as a Massachusetts business trust, which is not true of Sequoia. Sequoia is wrong. The *Northstar* court nowhere relies on these characteristics of the Schwab fund or on Massachusetts law in deciding the existence of a contract. Rather, the *Northstar* court only relies on those details in analyzing whether the *Schwab* defendants owed any fiduciary duties to the shareholders. 779 F.3d at 1056-57 (relying on the structure of the Schwab fund under Massachusetts law to evaluate the existence of fiduciary duties). In contrast, in analyzing the contract claim the *Northstar* court based its analysis on contract principles drawn from the Restatement (Second) of Contracts § 4 (1981) and from the United States Supreme Court's decision in *Woodward*, 17 U.S. 518, and not on any aspect of Massachusetts law. *Id.* at 1050-51.[22]

Contrary to the express teaching of *Northstar*, Defendant broadly argues instead that a "policy" described in a publicly filed disclosure document–such as a SAI–cannot constitute a contractual agreement. *See* Mot. at 12. This is wrong and/or irrelevant for three independently dispositive reasons. First, this not the basis of Plaintiffs' claim. Second, none of Sequoia's authorities stand for this broad proposition. Third, the *Northstar* court expressly rejected this proposition, distinguishing or disapproving of many of the very cases relied on by Sequoia.

*First*, Plaintiffs do not contend, as Defendant suggests, that every policy contained in an SEC disclosure automatically constitutes a binding contract. Rather, Sequoia's Concentration

---

[22] Indeed, that the *Northstar* court distinguished and/or disapproved of two in-Circuit decisions (*McKesson* and *Schwab*) and applied a third such decision (*Lapidus*) shows it was applying Ninth Circuit, not Massachusetts law.

Policy Restriction – which Sequoia chose to adopt – imposed a mandatory restriction on Sequoia's management of its fundamental investment objectives, which could not be changed without shareholder approval. Sequoia's agreement to bind itself to these restrictions established more than mere "policy." Unless and until the fundamental investment objectives were amended by shareholder vote, the Plaintiffs and other Class Members had a contractual right to have the Fund managed in accordance with those objectives. That is the ground on which *Northstar* found a contract and distinguishes most of Sequoia's authorities which did not concern a fundamental investment policy changeable only by a shareholder vote.

*Second*, Sequoia is wrong that its authorities stand for the broad proposition that "[c]ourts in Maryland and around the country have rejected the premise that a policy described in a publicly filed disclosure document constitutes a contractual agreement . . . and … particularly … policies set forth in a fund's SAI – serve informational purposes only and do not establish a contractual arrangement between shareholders and a fund." Mot. at 12.

*Oliveira v. Sugarman*, 130 A.3d 1085 (Md. Ct. Spec. App. 2016), upon which Defendant primarily relies, is readily distinguishable. The proxy statement and executive compensation plan ("the Plan") at issue there placed *no* restrictions on the company's board once the Plan was adopted, unlike Sequoia's Concentration Policy Restriction (or the policy at issue in *Northstar*). *Id.* at 1098 (noting that board could "take any other actions and make any other determinations that it deems necessary or appropriate in connection with the Plan" and had the right to "exercise its discretion hereunder at [any] time[.]") (citations omitted) Certainly, a plan that the board was free to ignore could not comprise an offer because there was nothing to enforce. *Id.* at 1102. The Maryland Court of Appeals agreed. *Oliveira*, 152 A3d 728, 744 (Md. 2017) (concluding that that the Board's discretion to ignore the Plan at will "weighs heavily against the finding of a

contract."). This court also noted that the Plan did not even address shareholders, let alone "make a promise to shareholders in exchange for any action or promise in return." *Id.* at 744. Unlike the board in *Oliveira*, Sequoia had no authority or discretion to deviate from or terminate its Concentration Policy Restriction without a shareholder vote once that Policy was adopted. And Sequoia's agreement was specifically made to shareholders.

As to *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003), the *Northstar* court considered this prior precedent from its own Circuit and found it "clearly distinguishable. *Northstar*, 779 F.3d at 1053. Without repeating the *Northstar* court's careful analysis, in *McKesson*, defendants asked the court to find that its shareholders were third-party beneficiaries of a merger agreement set forth in a prospectus and therefore should be found to have approved the merger. *McKesson*, 339 F.3d at 1092. The court determined that the shareholders were not third-party beneficiaries of the merger agreement, and the fact that the merger was referenced in the prospectus did not "convert McKesson's solicitation of the shareholders' vote into a contractual offer." *Id.* That was why the court opined that "the Prospectus did not serve as the basis for a contract between McKesson and the shareholders" as to the separate merger agreement. *Id.* at 1093. Plaintiffs here are not third-party beneficiaries to a separate agreement mentioned in a prospectus. Rather, they are shareholders in the Fund. By adopting the Concentration Policy Restrictions, Sequoia restricted the discretion otherwise conferred on it to manage the Fund for the benefit of its shareholders. *Northstar*, 779 F.3d at 1053 (recognizing the significance of a limitation on discretion to manage the fund as distinguishing that case from *McKesson*). Moreover, the Fund's Registration Statement, containing its SAI reflected the adoption of those restrictions, unlike in *McKesson*. *Id.* (distinguishing *McKesson* on this basis). In addition, Defendant's reliance on *McKesson* for the

proposition that a prospectus – which "offers" securities for sale should not be equated with a contractual "offer," is similarly unavailing. *See* Mot. at 15. Again, Defendant misconstrues Plaintiffs' argument by broadly suggesting that the Prospectus itself constitutes the "offer." Sequoia's "offer" in this case is its commitment to be bound by the restrictions contained in certain fundamental investment objectives in managing the Fund. While this "offer" may be described and disseminated in Sequoia's SAI and incorporated by reference in its Prospectus, the Prospectus itself does not constitute the offer.

Defendant relies on *In re Charles Schwab Corp. Securities Litigation*, No. 08-01510, 2009 WL 1371409 (N.D. Cal. May 15, 2009), even though the proposition for which Sequoia cites this case has been disapproved by that Circuit's appellate branch in *Northstar*. 779 F.3d at 1054 ("We find . . . unpersuasive the argument [in *Schwab*] that 'the prospectuses . . . here at issue are not contracts but rather are ***mandatory*** disclosure documents.'") (second ellipsis and emphasis in original) (quoting *Schwab*, 2009 WL 1371409, at *3)). Plaintiffs suggest that *Northstar* is a far more persuasive authority than *In re Charles Schwab*.

Finally, contrary to Defendant's contention, the court's statement in *Stichting Pensioenfonds ABP v Credit Suisse Group AG*, 966 N.Y.S.2d 349 (N.Y. Sup. Ct., N.Y. Cty. 2012) – that a prospectus, or a prospectus supplement, is not a contract – does not foreclose Plaintiffs' breach of contract claim here. Indeed, the *Stichting* court went on to state that "[h]owever, just because the Offering Documents which contained the alleged misstatements are not contracts ***does not mean that there is no contract here***." *Id*. at *5 (emphasis added). Specifically, the *Stichting* court recognized that even if offering documents do not constitute the written contract, they still constitute evidence of the contract. *Id*. Plaintiffs' claim is consistent with *Stichting* because Plaintiffs do not claim the contract is Sequoia's SAI, but instead is found

in the evidence of offer, acceptance, and consideration identified above.

*Third*, as already noted, rather than broadly focusing on the nature of a prospectus as an "informational" and "mandatory" disclosure device, the Court in *Northstar* analyzed the nature of the undertaking – a fund's fundamental investment objectives changeable only by shareholder vote – to determine the existence of an express or implied contract. Significantly, the Court in *Northstar* recognized the fact that once adopted, the fundamental investment objectives added "a structural restriction on the power conferred on the Trustees in the Agreement and Declaration of Trust that can only be changed by a vote of the shareholders." 779 F.3d at 38-39. Thus, the fund's violation of its investment policy and the shareholder's voting rights constituted the basis for the breach of contract claim.

## IV.  CONCLUSION

In support of its Motion, Sequoia relies upon a distorted interpretation of its promise that it would not concentrate more than 25% of its assets in any industry unless a majority of shareholders voted to modify or rescind this offer, caselaw that is distinguishable, an SEC staff opinion that was rescinded by the SEC approximately 17 years before the conduct at issue, and a mischaracterization of the nature of the breach of contract claim that Plaintiffs have asserted in the Complaint. Simply stated, Sequoia's Motion is a fatally flawed and transparent attempt to avoid liability for causing its shareholders to suffer hundreds of millions of dollars of losses. Accordingly, Plaintiffs respectfully submit that the Motion should be denied.

DATED:  New York, New York

August 30, 2018

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.


By /s/ Alan M. Pollack
Alan M. Pollack
amp@robinsonbrog.com
Felicia S. Ennis
fse@robinsonbrog.com
875 Third Avenue, 9th Floor
New York, NY 10022-0123
Phone: (212) 603-6300
Fax: (212) 956-2164

KELLER  ROHRBACK L.L.P.
Mark A. Griffin (*pro hac vice*)
mgriffin@kellerrohrback.com
Raymond J. Farrow (*pro hac vice*)
rfarrow@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Phone:  (206) 623-1900
Fax:  (206) 623-3384

Stanley H. Epstein (*pro hac vice*)
stanatty@yahoo.com
515 Ocean  Avenue #N507
Santa Monica, CA 90402
Phone: (310) 393-7619
Fax:  (310) 393-7684


***Attorneys for Plaintiffs***


4820-7360-6001, v. 1

26