UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS EDWARDS AND MICHAEL FORTUNE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>               Plaintiffs,<br><br>   v.<br><br>SEQUOIA FUND, INC., A MARYLAND CORPORATION,<br><br>               Defendant. | Civil Action No: 1:18-cv-04501(GBD)<br><br>CLASS ACTION |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION BY DEFENDANT SEQUOIA FUND, INC. TO DISMISS THE CLASS ACTION COMPLAINT**

Robert A. Skinner
Amy D. Roy
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560

Lee S. Gayer
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 841-0626

*Attorneys for Defendant Sequoia Fund, Inc.*

**TABLE OF CONTENTS**

                                                                **Page**

PRELIMINARY STATEMENT .................................................................................. 1

I.     THE PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THE EXISTENCE OF AN ENFORCEABLE IMPLIED CONTRACT ........................ 2

II.    THE PLAINTIFFS HAVE FAILED TO ALLEGE ANY VIOLATION OF THE FUND CONCENTRATION POLICY .......................................................... 7

CONCLUSION ............................................................................................................ 10

# TABLE OF AUTHORITIES

                                                                                 **Page(s)**

**Cases**

*City of Riviera Beach Gen. Emps. Ret. Sys. v. Mylan N.V.*,
    No. 2:15-cv-821, 2016 WL 4367549 (W.D. Penn. May 10, 2016) ...............................7

*Cochran v. Norkunas*,
    919 A.2d 700 (Md. 2007) ...............................................................................................4

*Lapine v. Seinfeld*,
    918 N.Y.S.2d 313 (N.Y. Sup. Ct., N.Y. Cty. 2011) ........................................................3

*Marlio v. McLaughlin*,
    734 N.Y.S.2d 4 (N.Y. App. Div., 1st Dep't 2001) .........................................................4

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) ........................................................................................7

*In re Morgan Stanley & Van Kampen Mut. Fund Secs. Litig.*,
    No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...................................9

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) ....................................................................................6, 7

*Oliveira v. Sugarman*,
    152 A.3d 728 (Md. 2017) .......................................................................................3, 5, 7

*Peoples Drug Stores v. Fenton Realty Corp.*,
    62 A.2d 273 (Md. 1948) .................................................................................................5

*Prince George's Cty. v. Silverman*,
    472 A.2d 104 (Md. Ct. Spec. App. 1984) ......................................................................3

*Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*,
    No. 653665/2011, 2012 WL 6929336 (N.Y. Sup. Ct., N.Y. Cty. Nov.
    30, 2012) ..................................................................................................................3, 6, 7

**Statutes**

Investment Company Act of 1940, 15 U.S.C. § 80a-8 ....................................................2, 3

**Other Authorities**

Enhanced Disclosure and New Prospectus Delivery Option for Registered
    Open-End Management Investment Companies, 74 Fed. Reg. 4546
    (Jan. 26, 2009) ................................................................................................................4

*How to Read a Mutual Fund Prospectus (Part 3 of 3: Management, Shareholder Information, and Statement of Additional Information)*, Secs. & Exch. Comm'n (June 13, 2016) ...................................................................3

Investment Company Liquidity Risk Management Programs, SEC Release Nos. 33-10233, IC 32315 ..............................................................................10

1 Thomas P. Lemke, et al., Regulation of Investment Companies (Matthew Bender, rev. ed. 2018) ................................................................................9

Registration Form Used by Open-End Management Investment Companies; Guidelines, 48 Fed. Reg. 37,928-02, Guide 19 (Aug. 22, 1983) ..................................................................................................... *passim*

Registration Form Used by Open-End Management Investment Companies, 63 Fed. Reg. 13,916-01 (Mar. 23, 1998) ....................................2, 8, 9, 10

SEC Form N-1A ...................................................................................................4

**PRELIMINARY STATEMENT**

As demonstrated in defendant's moving papers, Maryland and New York courts, and courts around the country, have held that inclusion of a policy in a required publicly-filed disclosure does not constitute conduct that can give rise to an implied contract.[1] The plaintiffs' opposition points to no Maryland or New York authority that holds otherwise. Instead, the plaintiffs try to distinguish the well-settled authority that defeats their claims by repeatedly asserting that the Fund's Concentration Policy is a "fundamental investment objective[]" that "imposed a mandatory restriction" on the Fund. Opp. at 21-22. But this purported "distinction" underscores the fundamental flaw in their position. As courts have made clear, it is *because* the disclosures are part of a mandatory disclosure regime that their inclusion in the Fund's disclosures does not reflect the voluntary manifestation of willingness to enter into a bargain that is the *sine qua non* of a contractual offer. This rule applies with particular force here because, as the SEC has made clear, the disclosures concerning the Fund's Concentration Policy are informational in nature, and thus lack any of the essential hallmarks of a contractual offer that can give rise to an implied contract.

Even if the plaintiffs could plausibly plead a breach of contract claim – which they cannot – their claim that the Fund breached the Concentration Policy is not viable. The plaintiffs concede that the Fund never made any acquisitions of assets that caused it to exceed the 25% threshold, and the SEC has made clear that passive increases in value do not constitute a violation of an industry concentration policy. Indeed, Guide 19 of the SEC's 1983 Guidelines expressly states that "***when securities of a given industry come to constitute more than 25 percent of the value***

---

[1] The plaintiffs acknowledge that the law of Maryland or New York governs here. Opp. at 6-7. However, the plaintiffs contend that this Court "need not" conduct a choice of law analysis. *Id.* at 6. The plaintiffs' request appears to be part of their effort to evade the decisions of the Maryland courts, which would apply under the internal affairs doctrine, and which firmly reject the plaintiffs' contract-based claim under both Maryland and New York law. *See* Mov. Br. at 11-12, 12-17. Even if this court were to apply a *lex loci* analysis, New York courts also have rejected the plaintiffs' breach of contract claim. *Id.* at 13-14. Accordingly, the plaintiffs' claim fails under the law of either jurisdiction.

*of the registrant's assets by reason of changes in value of either the concentrated securities or the other securities, the excess need not be sold*."[2] The plaintiffs now attempt to evade the passive increase guidance by arguing that while the SEC integrated Guide 19 into its 1998 Final Rule,[3] it only intended to continue the 25% benchmark set forth in Guide 19, but not the guidance on passive increases that explains how the benchmark applies. The plaintiffs' transparent and self-serving construction of applicable authority is firmly refuted by the plain language of the applicable SEC publications. Accordingly, for this reason as well, the Court should dismiss the Complaint in its entirety with prejudice.

## I. THE PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THE EXISTENCE OF AN ENFORCEABLE IMPLIED CONTRACT

The plaintiffs' opposition concedes that purchasers of Fund shares are not parties to any express agreement with the Fund. *See* Opp. at 19-20. The plaintiffs further concede that an SEC disclosure document such as a prospectus or SAI cannot itself constitute a contract between the Fund and its shareholders. *Id.* at 23-25. However, the plaintiffs repeatedly assert that under the Investment Company Act of 1940 (the "ICA"), the Concentration Policy is a "fundamental investment policy" that can only be modified by a vote of the Fund's shareholders – what the plaintiffs characterize as a "mandatory restriction." Opp. at 1-3 (referencing 15 U.S.C. § 80a-8), 22. Based on this purported distinction, the plaintiffs contend that the Fund's inclusion of the Concentration Policy in its SAI constitutes a "contractual offer" that was "accepted" and is enforceable by "everyone who purchased or held Fund shares." *Id.* at 1-2. Basic contract principles applied by Maryland and New York courts conclusively refute this sweeping claim.

---

[2] Registration Form Used by Open-End Management Investment Companies; Guidelines ("1983 Guidelines"), 48 Fed. Reg. 37,928-02, 37,962, Guide 19 (Aug. 22, 1983) (emphasis added).

[3] Registration Form Used by Open-End Management Investment Companies ("1998 Final Rule"), 63 Fed. Reg. 13,916-01 (Mar. 23, 1998).

First, as the plaintiffs themselves recognize, under both Maryland and New York law, an offer in the contractual sense requires the voluntary "manifestation of willingness to enter into a bargain."[4] Moreover, to establish an implied contract a plaintiff must establish the "'presumed' intention of the parties as indicated by their conduct." *See Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 318 (N.Y. Sup. Ct., N.Y. Cty. 2011). Here, however, the Fund's inclusion of the Concentration Policy in its SAI was not the result of voluntary and willing conduct that constituted an expression of an intent to extend a contractual offer. Instead, the Policy was *required* to be included in the Fund's SAI for informational purposes pursuant to the ICA and SEC rules.[5] It is for this reason that Maryland and New York courts have expressly ruled that information set forth in a mandatory disclosure does not constitute a contractual "promise to shareholders in exchange for any action or promise in return." *See Oliveira v. Sugarman*, 152 A.3d 728, 744 (Md. 2017). Specifically, the Maryland Court of Appeals ruled that "without language indicating a clear offer and intent to be bound," no contractual offer can be found. *Id.* at 745. New York law is in accord. *See, e.g., Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, No. 653665/2011, 2012 WL 6929336, at *5 (N.Y. Sup. Ct., N.Y. Cty. Nov. 30, 2012) (holding that a "*prospectus, or a prospectus supplement, is indeed not a contract*" and dismissing purported implied contract claim).[6]

---

[4] Opp. at 18 (quoting *Kolchins v. Evolution Mkts., Inc.*, 8 N.Y.S.3d 1, 9 (N.Y. App. Div., 1st Dep't 2015) (citing Restatement (Second) of Contracts § 24 (1981)), *aff'd*, 96 N.E. 784 (N.Y. 2018)); *see also Prince George's Cty. v. Silverman*, 472 A.2d 104, 112 (Md. Ct. Spec. App. 1984) (applying same contract principle).

[5] *Cf.* 15 U.S.C. § 80a-8(b)(1)-(3) (requirement to include); *How to Read a Mutual Fund Prospectus (Part 3 of 3: Management, Shareholder Information, and Statement of Additional Information)*, Secs. & Exch. Comm'n (June 13, 2016), https://www.investor.gov/news-alerts/investor-bulletins/how-read-mutual-fund-prospectus-part-3-3-management-shareholder-infor (noting that SAI contains mutual fund policies).

[6] The plaintiffs attempt to distance themselves from the notion that the prospectus itself was the contract by suggesting that the Fund's offer to provide a Concentration Policy and the shareholders' subsequent purchase of shares was the contract. Opp. at 1-2. The plaintiffs' hedged argument does not salvage their claim. That is because plaintiffs allege an *implied* contract based on purported *conduct* by the Fund – here, the inclusion of the Concentration Policy in the prospectus. But, as noted above, *but for* the SEC's requirement that the Fund's Concentration Policy be disclosed in the SAI, shareholders would not have even known about the term they now contend was the contract. As New York

Second, SEC rules, which the plaintiffs do not even attempt to address, make clear that the Concentration Policy disclosure is informational in nature and, therefore, cannot be considered an "offer" in the contractual sense.[7] Moreover, the SEC rules make clear that an SAI is a supplemental disclosure that is only reviewed by those investors interested in more detailed fund information than is required in the prospectus. *See* SEC Form N-1A, at v (Part C.2(b)); 2009 Final Rule, at 60. Unlike a fund's prospectus, an SAI is not even required to be delivered to prospective investors and instead typically is made available on a fund's website, as is the case here. *See* 2009 Final Rule, at 82. Not only does the purely informational nature of the SAI negate contractual intent, but the fact that it was not even communicated to potential investors as a definitive contractual offer that they were invited to "accept" also negates any intent to make an offer. Indeed, nowhere does the Complaint allege that the plaintiffs or putative class members actually were aware of the Concentration Policy at the time they invested in the Fund. The generic assertion that investors "accepted" the purported "offer" merely by investing in the Fund, *see* Compl. ¶¶ 45-46, is completely insufficient as a basis for an actual offer and acceptance, *see Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007) ("[m]anifestation of mutual assent includes . . . definiteness of terms"); *Marlio v. McLaughlin*, 734 N.Y.S.2d 4, 6 (N.Y. App. Div., 1st Dep't 2001) (same).

Third, the SAI does not provide information that sets forth how the Concentration Policy is to be applied. Instead, the SAI refers investors to "guidance" issued by the SEC if they are interested in reviewing further information concerning that issue. Gayer Decl., Ex. A, at 4; Compl. ¶ 22. Moreover, the plaintiffs affirmatively allege that the SEC's positions concerning how the

---

and Maryland authorities make clear, to demonstrate an implied contract, the plaintiffs need to show more than the Fund's separate compliance with SEC rules and regulations.

[7] *Cf.* Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-End Management Investment Companies ("2009 Final Rule"), 74 Fed. Reg. 4546, 4560 (Jan. 26, 2009) (noting that as part of "disclosure regime," required mutual fund disclosures provide investors with "access to the information [they] need, want, and *choose* to review" (emphasis added)).

4

industry concentration policy applies can change over time. While the plaintiffs' self-serving assertion that the SEC changed the manner in which the industry concentration policy is applied by removing the passive increase guidance (which conclusively defeats the plaintiffs' claim) is incorrect, as demonstrated in Point II, *infra*, the plaintiffs' acknowledgement that the policy can be changed by the SEC or removed entirely by a majority vote of the Fund's shareholders provides further confirmation that Fund investors – to the extent they were even aware of the Concentration Policy – could not reasonably view it as a contractual offer that they could "accept." *See Peoples Drug Stores v. Fenton Realty Corp.*, 62 A.2d 273, 276 (Md. 1948).

The plaintiffs' opposition does not cite to a single decision of either the Maryland or New York courts to support their effort to derive a contract claim from a required informational disclosure, and they fail in their efforts to distinguish the well-settled authorities to the contrary. For example, in a series of decisions in the *Oliveira* litigation, the Maryland courts firmly rejected the argument that the terms of a performance-based executive compensation plan set forth in a publicly-filed proxy statement can form a contract between the corporation and its shareholders. While it is true that the plan at issue in *Oliveira* could be modified or terminated by the iStar board, and that this feature weighed against a finding of an implied contract, the same features apply to the Concentration Policy at issue here. As noted above, the plaintiffs acknowledge that the Concentration Policy can be modified or terminated by a vote of the shareholders. Moreover, unlike the plan at issue in *Oliveira*, here *the plaintiffs allege* that the Concentration Policy can also be altered by the SEC, which adds another level of uncertainty not present in *Oliveira*. And in *Oliveira*, the shareholders actually voted on the proposed plan which, unlike the terms of the Concentration Policy at issue here, was fully set forth in a detailed appendix to the proxy. Despite these features, the Maryland courts concluded that the publicly-filed disclosure failed to establish

5

the elements of a contract between the company and its shareholders.

The plaintiffs' attempt to distinguish the New York court's decision in *Stichting* is completely disingenuous. There, the court expressly rejected the plaintiffs' contract claim, holding that the purpose of a prospectus is disclosure and that a "*prospectus, or a prospectus supplement, is indeed not a contract.*" *Stichting*, 2012 WL 6929336, at *5. While the court considered the possibility that a contract could nevertheless be found, that was based on the fact that the plaintiffs in *Stichting* alleged that a separate purchase and sale agreement was entered into between the plaintiff and one of the underwriting defendants. Even as to that non-prospectus based claim, the court ruled that the pleadings were not sufficient "to create a cause of action for breach of contract under American law." *Id.* However, in all events, the *Stichting* court firmly rejected the same prospectus-based claim advanced by the plaintiffs in this case.

The plaintiffs' reliance on the Ninth Circuit's decision in *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015), is misplaced for several reasons. First, contrary to the plaintiffs' contentions, the court in *Northstar* based its decision on the unique "features that *distinguish*[] a Massachusetts trust," one of which is that the purchasing shareholders "enter into a voluntary, consensual, and *contractual relationship*" by executing an agreement pursuant to which they become "a party" to a contract with the trust. *See id.* at 1040 (emphases added). This putative contractual relationship is completely lacking here (where the Fund is organized as a corporation) and the plaintiffs do not allege otherwise. Second, the *Northstar* court did not rule that a contract was formed based merely on the fund's "adopt[ion] and disseminat[ion]" of fundamental investment policies in an SAI, as the plaintiffs allege here. *See* Opp. at 19-20. Instead, the court determined that a contract could have been formed through "the mailing of the proxy statement [to shareholders] and the adoption of the two fundamental investment policies

6

after the shareholders voted to approve them." *Northstar*, 779 F.3d at 1054; *id.* at 1051-52. Again, no such action by the Fund or its shareholders is alleged to have occurred here. Third, the *Northstar* decision is a clear outlier that has not been followed by the courts of Maryland or New York, or by any other court. To the contrary, courts have continued to follow the Ninth Circuit's prior decision in *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1092-93 (9th Cir. 2003), which clearly holds that policies contained in a publicly-filed informational disclosure cannot form the basis of a contract. For example, in *City of Riviera Beach General Employees Retirement System v. Mylan N.V.*, No. 2:15-cv-821, 2016 WL 4367549 (W.D. Penn. May 10, 2016), the court declined to follow *Northstar*. Instead, the court adopted the Ninth Circuit's holding in *McKesson* that "mandatory disclosures in proxies do not constitute a contractual offer," calling this approach "well-reasoned and persuasive." *Id.* at \*10. Thus, relying on *McKesson*, *Oliveira*, *Stichting* and other authorities, the court rejected the plaintiff's prospectus-based breach of contract claim. *Id.* at \*6, \*10-11. This Court should do likewise.

## II. THE PLAINTIFFS HAVE FAILED TO ALLEGE ANY VIOLATION OF THE FUND CONCENTRATION POLICY

Even if the plaintiffs could plausibly allege a breach of contract claim, dismissal still would be warranted because they have not alleged any violation of the Fund's Concentration Policy. The plaintiffs concede that Guide 19 of the SEC's 1983 Guidelines includes the guidance on passive increases, which makes crystal clear that only *acquisitions* of assets that cause a fund to exceed the 25% concentration limit can trigger a violation of an industry concentration policy. Opp. at 8-10. The plaintiffs also concede that the Fund never made any *acquisitions* that caused the Fund to exceed the 25% threshold. *See id.* at 4. Recognizing that these concessions conclusively defeat any possible claim that the Fund violated its Concentration Policy, the plaintiffs try to evade the passive increase guidance by contending that although Guide 19 was expressly incorporated into

7

the current SEC rule – the 1998 Final Rule – the SEC only meant to incorporate the 25% threshold (the aspect of Guide 19 that the plaintiffs rely on for their purported breach claim) but conveniently "abandoned" the guidance on passive increases (the part of Guide 19 that defeats the plaintiffs' claim). *Id.* at 4-5, 6. The plaintiffs' contrived attempt to cherry-pick only the parts of Guide 19 that they deem helpful as having been incorporated into the 1998 Final Rule should be rejected.

As a threshold matter, the plaintiffs' interpretation is, on its face, not remotely plausible. The plaintiffs cannot cite to a single word in the 1998 Final Rule that supports their assertion that the SEC intended to continue the 25% limit set forth in Guide 19 but intended to discontinue application of the guidance on passive increases. Their convoluted 11-page exposition that contends that the SEC did so *implicitly* underscores the total lack of textual support for their claim. But more fundamentally, the theory the plaintiffs advance – that the SEC would adopt a new rule that overturns decades of practice in the mutual fund industry without providing an explanation (or even a comment) or an opportunity for the industry to comment – is not plausible on its face.[8]

In any event, any fair reading of the text of the relevant SEC releases confirms that the SEC intended to continue the entirety of Guide 19, not just those aspects of it that the plaintiffs seek to rely upon in this lawsuit. For the avoidance of doubt, the text of the "Concentration" section of the 1998 Final Rule is copied here:

> Concentration. The Commission proposed to **_continue_** to require a fund to disclose in its prospectus any policy to concentrate its investments in any industry or group of industries. This requirement reflects the view that such a policy is likely to be central to a fund's ability to achieve its investment objectives,[FN98] and that a fund that concentrates its investments will be subject to greater risks than funds that do not follow the policy. *The Commission's staff has taken the position for purposes of the concentration disclosure requirement that a fund investing more than 25% of its assets in an industry is concentrating in that industry.*[FN99]

---

[8] Such a change in SEC policy would turn the industry on its head, requiring funds to sell off profitable investments in contravention of both fund and investor expectations, and result in increased costs and restrictions on funds and fund management. The plaintiffs cite to nothing in the proposed rulemaking that preceded the adoption of the 1998 Final Rule that supports the notion that the SEC or anyone else intended to abandon the guidance on passive increases.

8

63 Fed. Reg. at 13,927 (emphases added). The term "continue" expressly references the earlier policies on the subject – *i.e.*, Guide 19 – and clearly contemplates that it be incorporated into the new rule intact. As direct support for the 25% concentration benchmark, Footnote 99 cites to "Guide 19 – Form N-1A" as its sole support. The 1998 Final Rule goes on to say that "[t]he Proposed Amendments incorporated this *percentage test* into Form N-1A." *Id.* (emphasis added). Thus, the 1998 Final Rule makes clear that not just the percentage, but also the "test" – *i.e.*, how that percentage threshold is to be applied – was carried forward into the new Rule.[9]

Unable to point to any text in the SEC rulemaking to support their interpretation, the plaintiffs next contend that the use of the word "investing" in the 1998 Final Rule indicates that the SEC intended to apply the 25% limit even to passive increases in the value of an investment because the word "investing" implies the passive *holding* of assets as opposed to the active *acquisition* of assets. Opp. at 12 & n.10. The plaintiffs cite to Black's Law Dictionary as support. But the plaintiffs' attempt to rely upon dictionary definitions to support their claim actually refutes the baseless contention that the word "investing" denotes the passive holding of an asset. To the

---

[9] In addition to disingenuously arguing that Guide 19 has been "rescinded" with respect to everything but the 25% concentration benchmark, the plaintiffs also attempt to sweep Guide 19 under the rug entirely by arguing that because it relates to a "defense" raised by the Fund, it "should not be considered" by this Court in adjudicating the motion to dismiss. *See* Opp. at 6, 10. But it is *the plaintiffs themselves who affirmatively refer to Guide 19 in the Complaint* and even paraphrase the very text they now try to hide from the Court. *See* Compl. ¶¶ 23-24; Opp. at 8-10. Moreover, the plaintiffs' request that Guide 19 not be considered is completely inconsistent with their assertion that the 25% threshold set forth in Guide 19 – an aspect of Guide 19 upon which their claim depends – *has been integrated into the 1998 Final Rule*, which the plaintiffs claim *should be considered by this Court*. *See* Opp. at 8-10. In all events, this Court obviously has the authority to consider SEC publications when deciding a motion to dismiss. *See* Mov. Br. at 18-20. The Court also should reject the plaintiffs' request that it disregard the Lemke treatise, which also confirms that the passive increase guidance continues to apply. *See* Opp. at 10-11; 1 Thomas P. Lemke, et al., Regulation of Investment Companies § 7.10[2] (Matthew Bender, rev. ed. 2018). Clearly, this Court may consider the leading treatise concerning investment management in evaluating the SEC's longstanding guidance. Indeed, courts in this Circuit routinely rely upon the Lemke treatise as authority in the area of mutual fund management. *See, e.g.*, *In re Morgan Stanley & Van Kampen Mut. Fund Secs. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *4 (S.D.N.Y. Apr. 18, 2006) (citing to Lemke's Regulation of Investment Companies). Moreover, the SEC itself refers to Lemke in the 1998 Final Rule at issue. The plaintiffs' assertion that the manner in which defendant cited to Lemke was designed to "mislead[]" the court, Opp. at 11, is disingenuous. To the contrary, the fact that defendant did not include citations to authority that is not related to the proposition in Lemke it relied upon reflects the opposite. In all events, Lemke stands on its own as leading authority that defeats the plaintiffs' claim.

contrary, the definitions cited by the plaintiffs confirm that in normal usage the term "investing" is consistent with active conduct, such as "commit[ting]" cash to acquire an asset, and not with the passive act of "holding" an asset. *Id.* In all events, the SEC's use of the word "investing" in the 1998 Final Rule does not support the contention that the SEC intended to abandon the passive increase guidance. Instead, it denotes the same active acquisition of assets that the SEC has used in the past.[10] *See* 63 Fed. Reg. at 13,927.

Finally, the plaintiffs complain that Justice Sherwood's comment in the State Court Action that any effort to re-plead would be a "fool's errand" does not accurately reflect Justice Sherwood's views concerning the *Epstein* plaintiffs' interpretation of the Fund's Concentration Policy. Opp. at 17-18. The plaintiffs' contention is incorrect and wholly beside the point. This Court need only review the transcript of the motion to dismiss hearing, which the plaintiffs have now attached as an exhibit to their opposition papers, to confirm the level of skepticism articulated by Justice Sherwood concerning the plaintiffs' claim. Pollack Decl., Ex. E, at 19-21. Suffice it to say that Justice Sherwood repeatedly made clear his view that the plaintiffs' interpretation of the Concentration Policy – the very same claim and interpretation leveled in this case – was not viable. That is precisely the reason why Mr. Epstein, the lead plaintiff in the *Epstein* case, abandoned the action and has now appeared in this Court as counsel, with his reconstituted breach of contract claim.

## **CONCLUSION**

The Fund respectfully requests that the Court dismiss the Complaint with prejudice.

---

[10] Moreover, the SEC's use of the guidance on passive increases with regard to industry concentration is in line with the SEC's recent interpretation of other investment concentration limits – *i.e.*, that they are only exceeded by the *acquisition* of assets and not by the rise in value of an investment position. *See, e.g.*, Investment Company Liquidity Risk Management Programs, SEC Release Nos. 33-10233, IC 32315, at 230 *available at* https://www.sec.gov/rules/final/2016/33-10233.pdf (stating that rule relating to illiquid assets is "a limit on a fund's ability to *acquire* illiquid investments" and therefore applies only "if, immediately after the acquisition, the fund would have invested more than 15% of its net assets in illiquid investments" (emphasis added)).

10

Dated: New York, New York
September 21, 2018

ROPES & GRAY LLP

By: /s/ Robert A. Skinner
     Robert A. Skinner

Robert A. Skinner
Amy D. Roy
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7560
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

Lee S. Gayer
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 841-8626
lee.gayer@ropesgray.com

*Attorneys for Defendant Sequoia Fund, Inc.*