

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS EDWARDS and MICHAEL FORTUNE,          :
*individually and on behalf of all others similarly*          :
*situated,*          :
          :
          :                    MEMORANDUM DECISION
                                         Plaintiffs,          :          AND ORDER
                    -against-          :
          :                    18 Civ. 4501 (GBD)
          :
SEQUOIA FUND, INC., *a Maryland Corporation,*          :
          :
                                         Defendant.          :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Thomas Edwards and Michael Fortune bring this putative class action asserting

a claim for breach of contract on behalf of themselves and other similarly situated investors in

Defendant Sequoia Fund, Inc.[1]  (*See* Compl.)  Defendant moves to dismiss for failure to state a

claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   (ECF No. 18.)

Defendant's motion is GRANTED.

## I.    FACTUAL BACKGROUND

Defendant is an open-ended investment company registered with the Securities and

Exchange Commission ("SEC") pursuant to the Investment Company Act of 1940 (the "1940

Act"), 15 U.S.C. §§ 80a-1 *et seq.*  (Compl. ¶ 12.)  Under the 1940 Act, a registered investment

company must file a registration statement with the SEC that contains, among other things, "a

recital of the policy of the registrant" regarding certain activities, including "a statement whether

---

[1] Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to certify a class of "all persons or entities who held shares in" Defendant's mutual fund (the "Fund") and "did not sell any part of their . . . shares between the start of the Class Period and October 20, 2015." (Compl., ECF No. 1, ¶ 33.)  The "Class Period" is defined as the period "when more than 25% of the Fund['s] assets were invested in healthcare industry stocks." (*Id.*)

the registrant reserves freedom of action to . . . concentrat[e] investments in a particular industry

or group of industries." 15 U.S.C. § 80a-8(b)(1). The registration statement must also include any

other "investment policies . . . changeable only if authorized by shareholder vote" and "all

policies . . . which the registrant deems matters of fundamental policy." *Id.* § 80a-8(b)(2)–(3); (*see*

*also* Compl. ¶ 18 (citing same)).

The 1940 Act further provides that a registered investment company cannot, among other

things, "deviate from its policy in respect of concentration of investments in any particular industry

or group of industries as recited in its registration statement" absent a "vote of a majority of its

outstanding voting securities." 15 U.S.C. § 80a-13(a)(3); (*see also* Compl. ¶ 21 (citing same)).

Pursuant to these requirements, the Fund's Registration Statement, which Plaintiffs allege

includes the Fund's Prospectus and Statement of Additional Information ("SAI") (Pls.' Opp'n to

Def's Mot. to Dismiss ("Opp'n"), ECF No. 28, at 14 (citing Compl. ¶ 14)), lists certain restrictions

that the "Fund has adopted . . . as a matter of fundamental investment policy, which may not be

changed without a stockholder vote of a majority of the outstanding voting securities." (Compl.

¶ 21 n.9 (quoting SAI dated May 1, 2015, at 3).) One of those policies (the "Concentration Policy")

is that the Fund will not:

> Concentrate investments in an industry, as concentration may be
> defined under the 1940 Act or the rules and regulations thereunder
> (as such statute, rules or regulations may be amended from time to
> time) or by guidance regarding, interpretations of, or exemptive
> orders under, the 1940 Act or the rules or regulations thereunder
> published by appropriate regulatory authorities.

(Compl. ¶ 22 (footnote and citations omitted).)

Neither the 1940 Act nor any SEC rules or regulations define "concentration." However,

in 1998, the SEC issued a release (the "1998 Release") regarding Form N-1A, the SEC's

registration form for open-ended investment companies, which describes "concentration" as

"investing more than 25% of the Fund's net assets in a particular industry or group of industries)." (Opp'n at 12 (quoting Registration Form Used by Open-End Management Investment Companies ("1998 Release"), 63 Fed. Reg. 13,916, 13,927 (Mar. 23, 1998).)

Citing this language in the 1998 Release, Plaintiffs allege that Defendant violated the Concentration Policy because the Fund's investments in the healthcare industry exceeded 25% of its assets in the Fund's quarterly SEC filings for the first three quarters of 2015. (*Id.*; *see also* Compl. ¶¶ 4–5, 26.) Plaintiffs further allege that the violation of the Concentration Policy occurred "primarily because the value of the Fund's investments in a single company, Valeant Pharmaceuticals, International, Inc. ('Valeant'), alone exceeded 25% of its net assets."[2] (Compl. ¶ 4.) Plaintiffs also allege that Valeant was the Fund's single largest investment, and that a decline in Valeant's stock price caused the Fund to lose over $600 million. (*Id.* ¶¶ 5–6.)

Plaintiffs argue that these alleged violations of the Concentration Policy were a breach of a "contractual agree[ment] to manage each shareholder's investment in a manner that was consistent with . . . the Concentration Policy." (*Id.* ¶¶ 2, 4.) Defendant argues that the Concentration Policy cannot form the basis of a contractual obligation and, even if it could, Plaintiffs have not alleged that the Concentration Policy was breached. (Mem. in Supp. of Mot. by Def. to Dismiss ("Mem."), ECF No. 19, at 4.)

## II.    LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,*

---

[2] Plaintiffs allege that the Fund held positions in three companies in the "healthcare" industry, which Plaintiffs define to include companies that use Standard Industry Classification Codes 283 (Manufacturing-Drugs) or 2834 (Pharmaceutical-Preparations). (Compl. ¶ 4 n.1.) "The Standard Industrial Classifications are a system used by federal agencies to categorize firms engaged in different types of business activity." *Decker v. Nw. Envtl. Defense Ctr.,* 568 U.S. 597, 604 (2013).

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks

and citation omitted).  This standard is met "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  In deciding a Rule 12(b)(6) motion, the court draws all reasonable inferences in the plaintiff's

favor.  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119 (2d

Cir. 2013) (internal citation omitted).

## III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR BREACH OF CONTRACT

Under New York law, a contract may be express or implied.[3]   *See Leibowitz v. Cornell

Univ.*, 584 F.3d 487, 507 (2d Cir. 2009).  "[A] contract implied in fact may result as an inference

from the facts and circumstances of the case, although not formally stated in words, and is derived

from the 'presumed' intention of the parties as indicated by their conduct." *Id.* at 506–07 (quoting

*Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)).  To state a claim for breach of contract,

"a plaintiff must adequately allege all of the elements of an enforceable contract (whether express

or implied-in-fact) including offer, acceptance and consideration, in addition to adequately

alleging the defendant's breach of the contract." *Forest Park Pictures v. Universal Television

Network, Inc.*, 683 F.3d 424, 432 (2d Cir. 2012).  Neither an enforceable contract nor a breach of

the contract has been adequately alleged here.

---

[3] "A federal court sitting in diversity must apply the choice of law rules of the forum state." *Licci ex rel.
Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).  Defendant notes that either New
York or Maryland law could apply to Plaintiffs' claims. (Mem. at 11.)  However, the parties agree that
there there is no actual conflict between those states' laws regarding the matters at issue here. (*Id.* at 12;
Opp'n at 6.)  Under New York's choice-of-law rules, "[i]f no actual conflict exists, and . . . New York is
among the relevant jurisdictions, the court may simply apply New York law." *Licci*, 672 F.3d at 157.

4

## A. Existence of a Contract

The Second Circuit does not appear to have addressed the question of whether statements in a corporation's prospectus or SAI can form the basis of a contractual obligation. *Northstar Financial Advisors, Inc. v. Schwab Investments*, the Ninth Circuit case upon which Plaintiffs chiefly rely, involved shareholders in a Massachusetts business trust. 779 F.3d at 1039. Under Massachusetts law, "[b]y an underlying contract, or in the provisions of a business trust instrument, or both, the parties *agree* on the operations of the venture." *Id.* at 1040 (quoting *Berry v. McCourt*, 204 N.E.2d 235, 240 (Ohio App. Ct. 1965)). In *Northstar*, the Agreement and Declaration of Trust stated, "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms hereof and to have become a party hereto." *Id.* The *Northstar* plaintiffs' claim for breach of contract was based, in part, on a proxy statement mailed to the shareholders. *Id.* at 1048. The proxy statement contained several proposals, including one that "the [t]rust would not invest more than 25% of [its mutual fund's] total assets in any industry." *Id.* The shareholders voted to approve the proposals, and the prospectus and SAI of the trust's mutual fund were updated to reflect them. *Id.* The plaintiffs alleged that the trust subsequently violated two policies in the approved proposals, including the concentration policy. *Id.*

In reversing the dismissal of the plaintiffs' breach of contract claim, the Ninth Circuit relied upon the unique nature of the relationship created by the business trust and the shareholders' approval of the proposals to distinguish *Northstar* from a prior case, *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003). *See Northstar*, 779 F.3d at 1043. In *McKesson*, the Ninth Circuit found that a "[p]rospectus did not serve as the basis for a contract between [the corporation] and its shareholders." 339 F.3d at 1093.

5

While the prospectus at issue in *McKesson* involved a merger agreement that the plaintiffs were not parties to, *see id.*, in *In re Charles Schwab Corporate Securities Litigation*, a California district court cited *McKesson* in dismissing a breach of contract claim premised on an agreement between a corporation and its shareholders.   No. 08 Civ. 1510 (WHA), 2009 WL 1371409, at *5 (N.D. Cal. May 15, 2009).   In *Schwab*, as here, the plaintiffs alleged that "when each investor purchased shares of [a] fund, the investor entered into a contract with the fund" that included certain "fundamental investment policies" listed in the fund's "prospectuses and SAIs" that "could be changed 'only by a vote of a majority of the fund's outstanding shares.'" *Id.* at *3.   One of the fund's policies provided that "the fund could not '[c]oncentrate its investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or the rules and regulations thereunder.'" *Id.*   The plaintiffs in *Schwab* alleged that the fund violated this policy "by redefining the term 'industry' to permit greater investment in mortgage-backed securities, *without a shareholder vote*." *Id.*   The *Schwab* court found that plaintiffs could not state a breach of contract claim because "the prospectuses and SAIs . . . are not contracts but are rather *mandatory* regulatory disclosure documents" and   the plaintiffs "offer[ed] no coherent theory as to why such documents should be deemed a separate contract with each investor." *Id.* at *4.

At least one New York trial court has also cited *McKesson* for the proposition that "a prospectus is not an offer to enter a contract." *Stichting Pensionenfonds ABP v. Credit Suisse Grp. AG*, Index No. 653665/2011, 2012 WL 6929336, at *5 (N.Y. Sup. Ct. N.Y. Cnty. 2012).   In *Stichting*, the plaintiff was issued certificates for securities pursuant to a purchase and sale contract. *Id.* at *5.   Thus, the court noted that "just because [a prospectus and its supplements] which contained the alleged misstatements are not contracts does not mean that there is no contract here." *Id.*   However, the court found that the purchase and sale contract could not serve as the basis for a

breach of contract claim indirectly premised on the prospectus. *Id.* The court explained that while the plaintiff was "reasonably entitled to expect, under its purchase and sale contract . . . , that the [c]ertificates would be consistent with the information in" the prospectus and its supplements, inconsistencies between the certificates and descriptions of the securities in the prospectus and supplements were "not enough to create a cause of action for breach of contract." *Id.*

Here, Plaintiffs argue that the Defendant's "voluntary adoption of a fundamental investment policy like the agreement not to concentrate more than 25% of its investments in a single industry . . . bound [Defendant] to operate the Fund in accordance with its stated investment policy." (Mem. at 1–2.) But "[t]he fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 372 (2d Cir. 2003) (citation omitted). No such meeting of the minds occurred here. Unlike in *Northstar*, where policies were adopted after approval of the shareholders, the Concentration Policy was adopted by Defendant alone. (*See* Opp'n at 1 ("Plaintiffs contend that Sequoia Fund, Inc. . . . chose to limit its own investment discretion . . . by adopting [the Concentration Policy].").). Thus, Defendant's adoption of the Concentration Policy cannot, in itself, form the basis of a contractual obligation.

Plaintiffs' allegation that the Concentration Policy was "described and disseminated in [the Fund's] SAI and incorporated by reference in its Prospectus" does not save their claim. (Opp'n at 24.) Plaintiffs contend that the "Prospectus itself does not constitute the offer."[4] (Opp'n at 24.) Nor does the inclusion of the Concentration Policy in the Prospectus and SAI provide a basis to

---

[4] Plaintiffs do not expressly address the issue of whether the SAI constitutes the offer. However, Plaintiffs have cited no authority that would support such a proposition. Even in *Northstar*, the Ninth Circuit expressed doubt as to whether an SAI could constitute an offer, because "[t]he SAI is not automatically provided to investors" and "[w]hile there may be some sophisticated shareholders who make the effort to ask for an SAI or read it with the care necessary to digest the relevant parts of a long and multifaceted document, . . . it is reasonable to assume that there are many ordinary shareholders who do not do so." *Northstar*, 779 F.3d at 1056 (citation omitted).

7

"presume[]" an intent to enter a contract, *Leibowitz*, 584 F.3d at 507, because once the Fund adopted the Concentration Policy, it was required to disclose the policy in its Registration Statement, which Plaintiffs allege includes the Prospectus and SAI. *See* 15 U.S.C. § 80a-8(b)(1). *Northstar* is not to the contrary.   In that case, the Ninth Circuit suggested that the fact that disclosure of a policy is mandatory does not "provide a license to ignore" a contractual obligation to follow that policy. *Id.* at 1054.  But the facts that led the Ninth Circuit to find such an obligation in *Northstar*—*i.e.*, that the policy at issue was "enshrined by shareholder approval" and that the shareholders were "parties to the Agreement and Declaration of Trust" that obligated the trustees to follow the policy—are not present here. *Id.*  In this case, as in *Schwab*, the Concentration Policy was not approved by the shareholders prior to its adoption, and Defendant is organized as a corporation rather than a business trust.  (Opp'n at 1–2.)

After the Concentration Policy was adopted and disseminated, Plaintiffs entered into separate agreements to purchase or continue their investments with the Fund.  (Compl. ¶ 46.)  But those agreements are similar to the purchase and sale contracts in *Stichting*.  Here, as in that case, Plaintiffs may have been "reasonably entitled to expect" that their investments would be managed in a manner "consistent with the information in" the Prospectus and SAI. *Stichting*, 2012 WL 6929336, at *5.  However, an inconsistency between how Plaintiffs' investments were managed and the information in the Prospectus and SAI is "not enough to create a cause of action for breach of contract." *Id.*

Because Plaintiffs have not alleged that the Concentration Policy was the subject of a contractual obligation between the parties, Plaintiffs cannot state a claim for breach of contract premised on that policy.

8

## B. Breach of Contract

Even assuming that the Concentration Policy could form the basis of a contractual obligation, Plaintiffs have not alleged that the Concentration Policy was violated.  Plaintiffs allege that Defendant "violated the Concentration Policy by allowing its investment in healthcare industry stocks . . . to exceed 25% of the value of [the Fund's] net assets and failing to take any action to bring the Fund within its policy limitations." (Compl. ¶ 50.)  Defendants argue that Plaintiffs have failed to show that the Concentration Policy was violated, because the complaint does not "allege that the Fund made *purchases* that caused it to exceed the 25% limit." (Mem. at 2.)

The Concentration Policy does not expressly prohibit the Fund from allowing the value of its investments in a given industry to exceed 25% of its assets.  Rather, it prohibits the Fund from "concentrat[ing]" its assets in an industry, and defines the term "concentration" by reference to "the 1940 Act or the rules and regulations thereunder . . . or by guidance . . . published by appropriate regulatory authorities." (Compl. ¶ 48.)

As noted above, neither the 1940 Act nor the applicable rules and regulations define "concentration."  However, the instructions for Form N-1A states that a registered investment company must "[d]isclose any policy to concentrate in securities of issuers in a particular industry or group of industries (i.e. investing more than 25% of the Fund's net assets in a particular industry or group of industries)." (Opp'n at 12 (1998 Release, 63 Fed. Reg. at 13,927.)

In 1983, when Form N-1A was first adopted, the SEC published a release (the "1983 Release") that contained several Guides designed to assist funds in preparing their registration statements. (1998 Release at 13,940.)  In their complaint, Plaintiffs acknowledge that the 1983 Release contained "guidance concerning when the Concentration Policy was enforceable" that

9

"limited the Concentration valuation to the time of purchase of a security."[5]   (Compl. ¶ 24.)

Nonetheless, Plaintiffs argue that this court should not consider the 1983 Release in determining

whether the Concentration Policy was violated, because the 1983 Release has been "rescinded . . .

by the SEC." (Opp'n at 7; *see also* Compl. ¶ 24.)  Plaintiffs' argument is based upon a footnote

in the 1998 Release, which states, "The Guides have not been republished with Form N-1A, as

amended" and will not "apply to registration statements prepared on the amended Form.   The

Commission is also rescinding the Guides Releases." (1998 Release at 13,940 n.214.)

However, the 1998 Release does not state that the SEC no longer holds the positions

articulated in the Guides and Guides Releases.  In fact, the 1998 Release cites Guide 19 of the

1983 Release in noting that "[t]he Commission's staff has taken the position . . . that a fund

investing more than 25% of its assets in an industry is concentrating in that industry."   (1998

Release at 13,940 & n.99 (citing Guide 19 to Form N-1A).)  The 1998 Release further states that

the SEC "*continues to believe* that 25% is an appropriate benchmark to gauge the level of

investment concentration that could expose investors to additional risk" and that the SEC has

"incorporated this percentage test" into the amended Form N-1A.   (1998 Release at 13,940

(emphasis added).)

Plaintiffs assert that the phrase "percentage test" should be interpreted to refer only to the

25% threshold and not the statement in the 1983 Release as to how the threshold should be

calculated. (Opp'n at 5.)  However, Plaintiffs cite no authority to support this interpretation.

---

[5] Guide 19 of the 1983 Release, the provision to which Plaintiffs refer, states that "when securities of a given industry come to constitutes more than 25% of the value of the registrant's assets by reason of changes in value of either the concentrated securities or the other securities, the excess need not be sold." Registration Form Used by Open-End Management Investment Companies; Guidelines, 48 Fed. Reg. 37,928, 37,962 (Aug. 22, 1983).

Even if this Court were to accept Plaintiffs' argument that the 1998 Release rescinded the

SEC's position in the 1983 Release that an increase in value of held shares does not require a sale

of the excess over the 25% threshold, the SEC has not issued any subsequent guidance as to how

the 25% threshold should be calculated.  Plaintiffs argue that the reference to "*investing* more than

25% of [a fund's] assets" in the 1998 Release should be interpreted to mean "*holding* more than

25%." (*Id.* at 12 (emphasis added).)  But Plaintiffs cite no case law or SEC guidance interpreting

the phrase "investing" to mean "holding."[6]  Even the dictionary definitions of the term "invest"

upon which Plaintiffs rely refer to actions taken with money.  (*See id.* at 12 n.10 (defining "invest"

as "[t]o *apply* (money) for profit" and "to *commit* (money) in order to earn a financial return"

((citing Black's Law Dictionary (10th ed. 2014); Merriam-Webster, http://www.merriam-

webster.com/dictionary/invest) (emphases added).)  Because Plaintiffs have provided no evidence

that the SEC redefined the concept of "investing" to include passive increases in the value of an

investment, Plaintiffs have not shown that the Concentration Policy was violated.

---

[6] Plaintiffs' interpretation of the concept of "investing" would require investment companies to continually monitor their investments to make sure that the value of their investments in any given industry never exceeded 25% of their assets. At oral argument, Plaintiffs conceded that no such requirement existed prior to the 1998 Release. (Transcript of Oral Argument, ECF No. 31, at 27:9–20.) As Defendants have noted, it seems unlikely that the SEC would impose this new requirement implicitly, without providing explicit notice or guidance to investment companies. (Reply at 8 & n.8.) It also seems unlikely that the Fund would be the only entity to have ever violated such a requirement.  However, Plaintiffs have not cited any SEC enforcement actions based on similar violations.

12

## IV.   CONCLUSION

Defendant's motion to dismiss, (ECF No. 18), is GRANTED.   The Clerk of Court is

directed to close the motion, and this case, accordingly.

Dated: New York, New York
       October 18, 2018

SO ORDERED.

_George B Donals_

GEORGE B. DANIELS
United States District Judge

12